1  Susan Foley   SB 234319
   LAW OFFICES OF SUSAN FOLEY
2  3242 Countryside Drive
   San Mateo, CA  94403
3  Tel: (650) 345.2300
   Fax: (650) 345.2302
4
   Attorney for
5  ERIC RODRIGUEZ and
   KIMBERLIN RODRIGUEZ
6
   Plaintiffs
7

8
                **IN THE UNITED STATES DISTRICT COURT**
9
             **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
10

11

12  ERIC RODRIGUEZ and                    CASE NO.   C 0702360 PJH
    KIMBERLIN RODRIGUEZ

13
                                          PLAINTIFF'S POINTS & AUTHORITIES
14                                        IN SUPPORT OF MOTION FOR
                          Plaintiffs,     SUMMARY JUDGMENT
15
                                          DATE:   April 9, 2008
16        vs.                             TIME:
                                          COURTROOM:  3, 17th Floor
17
    SAN MATEO UNION HIGH
18  SCHOOL  DISTRICT,

19                        Defendant.

20

21  ────────────────────────────

22

23

24

25

26

27

28
                                     1

# TABLE OF CONTENTS

INTRODUCTION...................................................................................... 5

JURISDICTION........................................................................................ 5

STANDARD OF REVIEW......................................................................... 6

THE PARTIES.........................................................................................7

ISSUES..................................................................................................... 8

STATEMENT OF FACTS..........................................................................8

LEGAL ARGUMENT..............................................................................16

I    A SCHOOL DISTRICT CANNOT ESCAPE ITS OBLIGATION
     TO PROVIDE A FREE, APPROPRIATE PUBLIC EDUCATION
     TO A LEARNING-DISABLED STUDENT SIMPLY BECAUSE
     THE STUDENT HAS BEEN MADE A WARD OF THE COURT............16

     A.  AT ALL RELEVANT TIMES HEREIN, PLAINTIFF WAS
         ENTITLED TO A FAPE, INCLUDING THE TIME PERIOD
         THAT HE ATTENDED COURT-ORDERED SCHOOLS
         PURSUANT TO THE IDEA, TITLE  34, CFR, § 300.2 AND
         *COUNTY OF LOS ANGELES V. JOANNE SMITH*,
         74 Cal.App.4th 500 (1999)...........................................................16

II   THE DISTRICT DENIED ERIC A FAPE DURING
     THE TIME ERIC ATTENDED ITS HIGH SCHOOL LEADING
     UP TO THE COURT-ORDERED PLACEMENTS................................22

     A.  THE DISTRICT DENIED PLAINTIFF A FAPE WHEN
         IT FAILED TO ASSESS PLAINTIFF'S NEEDS IN
         THE AREA OF BEHAVIOR DESPITE THE DISTRICT'S
         KNOWLEDGE THAT ERIC'S BEHAVIOR WAS THE
         IMPEDIMENT TO HIS LEARNING..............................................22

     B.  THE NOVEMBER 12, 2002, (THE OPERATIVE IEP
         DURING THE STATUTORY PERIOD - FROM JULY, 2003)
         WAS DRAFTED WITHOUT UPDATED EVALUATIONS
         OF ERIC'S PERFORMANCE AND ACADEMIC LEVELS
         AND WITHOUT EVALUATING ERIC'S BEHAVIORAL
         NEEDS THEREBY DENYING ERIC A FAPE....................................23

     C.  THE MAY, 2003, IEP-TEAM DID NOT INCLUDE
         THE APPROPRIATE PROFESSIONALS TO
         ADDRESS ERIC'S BEHAVIORAL AND
         MENTAL-HEALTH NEEDS...........................................................24

D.  THE DISTRICT DID NOT OFFER ERIC DIRECT
    SPEECH-LANGUAGE THERAPY DESPITE HIS
    SPEECH PATHOLOGIST'S IDENTIFYING THAT
    NEED RESULTING IN A DENIAL OF FAPE…………….…………24

E.  THE DISTRICT DENIED PLAINTIFF A FAPE WHEN IT
    FAILED TO PROVIDE PLAINTIFF WITH MENTAL-
    HEALTH SERVICES……………………………………….………25

F.  THE DISTRICT DENIED ERIC A FAPE
    WHEN IT FAILED TO CONSTITUTE A
    COMPLETE IEP TEAM THAT INCLUDED A
    SCHOOL PSYCHOLOGIST ON NOVEMBER 13, 2003…………….…25

G.  THE DISTRICT DENIED ERIC A FAPE WHEN
    IT FAILED TO ASCERTAIN ERIC'S PRESENT LEVELS
    OF FUNCTIONING PURSUANT TO CAL. ED. CODE 56345 (1)
    AND 20 USC 1414 (d)…………………………………………….…27

III     **PLAINTIFF'S MOTHER IS ENTITLED TO
        REIMBURSEMENT OF ALL COSTS INCURRED BY
        HER RELATING TO PLAINTIFF'S EDUCATION FROM
        FEBRUARY, 2004, THROUGH JUNE, 2006, PURSUANT
        TO *JOHN K. v. WILSON RILES*, 170 Cal.App.3d 783**……………………29

IV      **CONCLUSION**………………………………………………….………31

## TABLE OF AUTHORITIES

*Alamo Heights Indep. School Dist. v. State Bd. of Educ.,*
790 F.2d 1153 (5th Cir. 1986)……………………………………............................29

*County of Los Angeles v. JoAnne Smith,*
74 Cal.App.4th 500 (1999)……………………………………………………..16

*Doe ex rel. Doe v. Metropolitan Nashville Public Schools,*
133 F. 3d 384, 387 (6th Cir. 1998). …………………………………………..…7

*Florence County School District 4 v. Carter* 4,
510 U.S. 7,12……………………………………………………………………16

*In Jeremy Magyar, by and through his father,*
*Steven Magyar, v. Tucson Unified School District,*
958 F. Supp. 1423 (1997)………………………………………………………..20

*In re JOHN K., a Minor, RICHARD LA POINTE, as Superintendent, etc.*
*et al, Plaintiffs and Respondents, v. JOHN K., a Minor, etc. et al.*
*Defendants and Appellants; WILSON RILES, as State Superintendent, etc.,*
170 Cal.App.3d 783 (1985)………………………………………………………*supra.*

*Knable ex rel. Knable v. Bexley City Sch. Dist.,*
238 F. 3d 775, 764 (6th Cir. 2001.)……………………………………………7

In *Mrs. B., M.M. v. Milford Board of Education,*
(103 F.3d 1114 1997)…………………………………………………..…………19

### Statutes
20 U.S.C. §1415(i)(2)(A)……………………………………………………..…5
20 U.S.C. § 1400(c)(2)(B-E)  ……………………………………………………..6
20 U.S.C. § 1414(d)  …………………………………………………………..…..6
20 U.S.C. § 1415(B)(6)……………………………………………………………6
20 U.S.C. § 1415 (F)(1)…………………………………………………………...6
Title 34, CFR § 300.2…………………………………………………….………16
Cal Ed. Code 56505(k)……………………………………………………………7
Cal Ed. Code 56341(5)……………………………………………………...……23
Calif. CCR, § 3052…………………………………………………………….25, 26

**INTRODUCTION**

At the heart of this case is the right of Student's parent to reimbursement of $171,000.00 she was ordered by the San Mateo County Juvenile Court to spend on Student's court-ordered education after the Court made student a ward and assumed apparent control over his educational placement from Defendant High School District.

Defendant District was well aware of the court's actions and also knew that those actions did not eliminate its continuing obligation to provide Student a free, appropriate public education. Instead of acknowledging its continuing obligation and stepping forward with appropriate action, the District chose to do **nothing** when it observed that parent was apparently ignorant of the fact that the Court's order had done nothing to excuse the District form its legal obligations to student.

Parent eventually sought counsel and learned that the District's continuing obligation was not, in fact, excused by the Juvenile Court's order.

In the administrative action below, the district acknowledged that it was aware of the juvenile court's orders and the fact that they did not excuse its continuing obligation. It claimed that its obligation **was** excused, however, by mother's failure to provide formal notice to the school district of the orders of the juvenile court and the fact that she and student planned to comply. The ALJ apparently agreed and this appeal followed.

**JURISDICTION**

This action is brought pursuant to Section 1415(i)(2)(A) of Title 20 of the United States Code, also referred to as the Individuals With Disabilities Education Act (reauthorized July 1, 2005), (*hereinafter* "IDEA"). (20 U.S.C. §1415(i)(2)(A). *See generally* 20 U.S.C. §§ 1400, *et seq.*).

In *STUDENT v. SAN MATEO UNION HIGH SCHOOL DISTRICT*, Case No. N2006070550 *hereinafter* "the underlying case"), before the Office of Administrative Hearings, Plaintiffs have been aggrieved by the Decision and Order dated February 8, 2007, by the Office of Administrative Hearings, received by Plaintiffs on or about February 8, 2007.

1    IDEA (formerly known as the Education For All Handicapped Children Act, P.L. 94-

2    142) was adopted in 1975 to ensure that all children with qualifying disabilities receive a public

3    school education.  In adopting IDEA, Congress found that over one million disabled children

4    were not receiving an appropriate education, and the "more than one-half of the children with

5    disabilities in the United States did not receive appropriate educational services that would

6    enable such children to have full equality of opportunity...1,000,000 of the children with

7    disabilities in the United States were excluded entirely from the public school system and did not

8    go through the educational process with their peers...there were many children with disabilities

9    throughout the United States participating in regular school programs whose disabilities

10   prevented such children from having a successful educational experience because their

11   disabilities were undetected...because of the lack of adequate services within the public school

12   system, families were often forced to find services outside the public school system, often at

13   great distance from their residence and at their own expense."  (20 U.S.C. § 1400(c)(2)(B-E).)

14   Therefore, Congress adopted IDEA "to ensure that all children with disabilities have available to

15   them a free appropriate public education that emphasizes special education and related services

16   designed to meet their unique needs and prepare them for employment and independent living."

17   (20 U.S.C. § 1400(d).)  Congress reauthorized the IDEA in 2004 and the reauthorized IDEA is

18   known as Individuals with Disabilities Education Improvement Act ("IDEiA").

19        Educational programs for handicapped children are designed and implemented through

20   Individualized Education Programs (IEP)-documents, which are required to contain, among other

21   things, written statements of the following: A specific offer of placement, the child's present

22   levels of educational performances, annual goals, and the specific educational services to be

23   provided to the child and the extent to which the child will be educated in regular-education

24   programs.  (20 U.S.C. § 1414(d).)

25        Pursuant to 20 U.S.C. § 1415 (b)(6), whenever a parent disagrees with a proposed

26   Individualized Education Program, the parent may file a complaint with respect to any matter

27   relating to the identification, evaluation, or educational placement of the child, or the provision

28   of a free appropriate public education to the child.  Pursuant to 20 U.S.C. § 1415(f)(1), whenever

such a complaint has been received, the parent shall have an opportunity for an impartial due process hearing which shall be conducted by the State educational agency.  As required by IDEA, California has established an impartial due process hearing procedure through contract with the Office of Administrative Hearings, Sacramento, California.  Both parties have a right to appeal the hearing decision to a court of competent jurisdiction within ninety days of the receipt of the administrative-law decision (Cal. Ed. Code § 56505 (k).)  This case is an appeal from the administrative-law decision by Administrative Law Judge (ALJ) Suzanne B. Brown dated February 8, 2007.

## STANDARD OF REVIEW

In IDEA cases, the reviewing court is to review the evidence :

**According to this "modified de novo" standard of review, "a district court is required to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings."** *Knable ex rel. Knable v. Bexley City Sch. Dist.* 238 F. 3d 775, 764 (6th Cir. 2001.)

## THE PARTIES

ERIC RODRIGUEZ, (hereinafter "Student" or "Eric") was a resident of the City of San Mateo, County of San Mateo, California residing with his mother, Kimberlin Rodriguez, (hereinafter "KR") within the jurisdictional boundaries of defendant, THE SAN MATEO UNION HIGH SCHOOL DISTRICT, (hereinafter referred to as "the District" or "SMUHSD") at all relevant times at issue in this case.

## ISSUES

The first issue before the court is whether or not a school district can escape its obligation and deny their disabled student's right to a free, appropriate public education simply because the student was made a ward of the court.

The second question before the court is whether or not Plaintiff was denied a free, appropriate, public education while attending defendant's school from November, 2003, through

1    March, 2004, prior to the juvenile court ordering him to an out-of-state residential placement.

2        The ALJ's Hearing Decision's conclusions are not supported by the evidence or

3    prevailing case law in this jurisdiction and should be overturned so that Plaintiff, Eric

4    Rodriguez's, rights, pursuant to the Individuals with Disabilities Education Act, are upheld.

5

6                              **STATEMENT OF FACTS**

7        Plaintiff, ERIC RODRIGUEZ, was born on September 30, 1987.  Eric is currently twenty

8    years old.  Plaintiff, KIMBERLIN RODRIGUEZ, is the natural mother of ERIC RODRIGUEZ.

9        Plaintiff, ERIC RODRIGUEZ, was made eligible as a student with a Specific Learning

10   Disability and a student with a Speech Language Impairment on November 26, 1990, during his

11   3rd grade year while a student in the San Mateo-Foster City Elementary School District.  Eric

12   was provided an Individualized Education Plan ("IEP") during 3rd grade. (Test. of KR - Vol. II,

13   p.240, lines 6-23; IEP of 11/26/01, Vol. VI, p. 1)

14       Eric remained eligible for special education under those two categories for the duration of

15   his school career, including the time periods relevant herein (July, 2003, through June, 2006.)

16   (Test. of KR, Vol. II, p. 242, lines 14-16; .)

17       During Eric's 8th grade year, his speech-pathologist rendered his dysfluencies (stuttering)

18   as moderate to severe and recommended that he continue with Direct Instructional Services

19   (DIS) to address his needs on a pull-out therapy basis.  (IEP of 4/9/02 – Vol. VI, p. 01205.)

20       Eric's April 9, 2002, IEP placed him in a Special-Day class (SDC) and provided 3

21   periods per month of direct speech-language therapy.  (IEP of 4/9/02 – Vol. VI, p. 01197.)

22       At times, Eric's dysflunecy was so severe, at times, he could not even begin a sentence.

23   (Test. of K. Rodriquez, Vol. II, p. 00241  Lines: 1-3.)

24       During the 2002-2003 school year, ERIC was a 9th grade student attending San Mateo

25   Union High School District's Hillsdale High School.  (Vol. II, p. 00243, lines 23-25, p. 00243,

26   lines: 1-2)

27       The District performed no testing as to Eric's performance levels during his 9th grade

28

1   year.  Eric's SDC teacher requested that Eric's mother waive the triannual testing. (Vol. VI, p.

2   01210; p. 01212.)

3       Eric's triannual IEP meeting was held on October 4, 2002.  Eric's program remained the

4   same, placing him in a SDC with 3 periods per month of DIS speech-language therapy.  It was

5   noted on the IEP document that Eric's level of anger contributed to his **not being successful in**

6   **school**. (Vol. VI, p. 01216 and 01218.)

7       The IEP of 10/4/02, noted that Eric's math skills had regressed from 3.5 years below

8   grade level to 5.5 years below grade level. Eric's performance in the classroom was described as

9   follows:  "Eric does not pay attention to oral lessons or to lessons being read in class.  He does

10   not stay on task to complete assignments as he has turned in almost no assignments." (IEP –

11   10/4/02, Vol. VI, p. 01223.)

12      The IEP of 10/4/02 noted Eric's attendance and punctuality as a problem, "Eric has

13   difficulty getting to class on time whether it be 1st period, or class during the day.  When

14   assigned detention, he doesn't show – there is no reaction at all."  (IEP – 10/4/02, Vol. VI, p.

15   01224)

16      The IEP of 10/4/02 also noted that: "he is demonstrating defiant behaviors which are not

17   going to make him successful this year, he continues to have problems with attitude, use of class

18   time and completion of assignments."  (IEP – 10/4/02, Vol. VI, p. 01225.)

19      Eric's speech-language pathologist, Lisa Fox, submitted her report to the IEP team and it

20   was made a part of Eric's 10/4/02 IEP.  Speech Pathologist Fox recommended direct

21   instructional services for Eric's moderate to severe dysfluency.  (Vol. VI, p. 01226.)

22      On 10/17/02, Eric was referred to the School Safety Advocate due to negative behaviors

23   and his unwillingness to make changes.  The description of Eric's behaviors included:  "tries to

24   get students to misbehave, calls female students unapprorpaite (sic) sexual names, pokes students

25   with open paper clips …stealing items from teacher."  (Vol. VI, p. 01240.)

26      An IEP-Team meeting was held on November 12, 2002, with no changes made in Eric's

27   IEP (IEP 11/12/02, Vol. VI, p. 01244.)

28

1      On 11/12/02 a Behavior Support Plan (BSP) was written which stated that the behavior

2  that was impeding Eric's learning was his "inappropriate classroom behavior because he does

3  not focus on class presentation/participation." The BSP did not address Eric's truancy or other

4  behaviors described on the referral to the School Safety Advocate. (Vol. VI, p. 01249.)

5      Eric was suspended from school for 2 days on December 9, 2002 for disrupting school

6  activities and willfully defying school personnel in the performance of their duties (Cal. Ed.

7  Code 48900 (k) (Vol. VI, p. 01234.)

8      Eric was suspended from school for 3 days on April 4, 2003, for disrupting school

9  activities and willfully defying school personnel in the performance of their duties (Cal. Ed.

10  Code 48900 (k.) (Vol. VI, p. 01235.)

11      Between September 17, 2002, and February 18, 2004, there were 29 referrals for

12  disciplinary action, including truancies, disruptive behavior, sexual harassment and use of

13  obscene/profane language, which resulted in various detentions, in-house suspensions and

14  suspensions. Eric was also removed permanently from his P.E. class for being out of control and

15  it was noted on the discipline report that a "BIP" Needed (Behavior Intervention Plan.) (Vol. VI,

16  p. 01254; 01394-01397.)

17      Eric's mother wrote to Marvin Meyers, the District's Director of Special Education on

18  April 8, 2003, requesting a change of placement due to Eric's behavior and his inability to

19  benefit in his current placement. (Test. Of KR, Vol. II, p. 00219, lines: 3-19, Vol. VI, p. 01252.)

20      An IEP-Team meeting was held on May 1, 2003, that resulted in no changes to Eric's

21  IPE. (Test. Of KR, Vol. II, p. 00249, lines: 17 – 23, Vol. VI, p. 01258)

22      Eric's SDC teacher, Pam Rianda, submitted her report which was made a part of the

23  5/1/03 IEP document that stated:

24

25             **Negative behaviors continue to interfere with Eric's**
               **progress. Referrals are for habitual tardies, defiance of**

26             **authority, use of profanity and making inappropriate**
               **comments to and about other students. He continues to**

27             **exhibit difficulties with task completion and compliance**
               **with school and classroom rules. He does what he**

28

1    **wants, when he wants and ignores any direction which is not to his liking.   His behavior is totaling (sic) distracting to the class and instruction.   He has no motivation to be engaged and would rather talk and pull others off task also."** (Vol. VI, p. 01265.)

On May 15, 2003, Eric was arrested, during school hours, for stealing alcohol and being in possession of same, from a local grocery store. (Vol. VI, p. 01285.)

On November 13, 2003, an IEP-Team meeting was held for Eric's Annual IEP.   It is noted on the IEP document that "Eric's greatest weakness is his truancy."  Eric's GPA was 0.923 at this time.   District personnel contended that testing was not performed on Eric due to excessive absences.  It was further noted that "it is difficult to gauge whether or not the current placement is effective due to excessive absences on Eric's part."  (Vol. VI, p. 01274.)

Eric was failing all of his classes due to excessive absences at the time of the November 13, 2003, IEP meeting.  (Vol. VI, p. 01276.)

Eric's speech pathologist, Lisa Fox, submitted a report which was made a part of the IEP document that recommended:

   **"…there has been no progress on goals.**

   **Although Eric continues to be eligible for DIS speech services as part of his IEP, the delivery of those services has been compromised by his inability or refusal to attend school regularly.   The nature of stuttering therapy requires consistent effort…."** (Vol. VI, p. 01279.)

A Behavior Support Plan was made a part of the IEP document that stated that the behavior impeding Eric's learning is truancy because "student does not attend class."  The BSP then goes on to state that the teaching strategies and necessary curriculum or materials for new behavior instruction is for a daily check on Eric's planner and 1:1 work on assignments 2X/wk during tutorial.  The BSP does not outline any strategies to have Eric attend class and/or school.

1   (Vol. VI, p. 01280.)

2       There was only one goal incorporated into Eric's November 13, 2003, IEP that states "To

3   decrease dysfluency rate in Reading."  (Vol. VI, p. 01281.)  No academic goals, social goals or

4   goals related to behavior were part of Eric's 11/13/03 IEP.

5       Eric was suspended from school for 2 days on December 10, 2003, for disrupting school

6   activities and willfully defying school personnel in the performance of their duties (Cal. Ed.

7   Code 48900 (j) (Vol. VI, p. 01237.)

8

9       Eric was suspended from school for 2 1/2 days on January 23, 2004, for cutting class and

10  smoking cigarettes on campus (Cal. Ed. Code 48900 (k); (Cal. Ed. Code 48900 (h.)) (Vol. VI, p.

11  01238.)

12      Eric was suspended from school for 3 days on February 5, 2004, for cutting class,

13  smoking on campus, being in possession of drug paraphernalia, disrupting school activities, and

14  willfully defying school personnel in the performance of their duties.  He was also suspected of

15  setting a fire. (Cal. Ed. Code 48900 (h);(j);(k.) (Vol. VI, p. 01237.)

16

17      On February 12, 2004, Eric's SDC teacher, Jessica Hahn, noted in the communication log

18  that she had not seen Eric for a couple of weeks (Vol. VI, p. 01250.)

19      On March 4, 2004, Eric was adjudged a ward of the court as a result of the arrest in May,

20  2003, when he skipped school and committed a larceny at the local grocery store.  Eric was

21  placed on probation and placed in the home of his mother.  Eric was ordered, by the San Mateo

22  County Juvenile Court, to attend The Rocky Mountain Academy at parent's expense. (Vol. VI, p.

23  01287.)

24

25      District personnel were aware that Eric was on probation and being placed at The Rocky

26  Mountain Academy by probation. (Test. Of M. Meyers, Vol. III, p. 00477, lines: 3 – 7.)

27      KR informed SDC Teacher, Jessica Hahn, while Eric was still attending Hillsdale High

28

12

1  School (CEDU was a part of the Rocky Mountain Academy (Ascent) program.) that it was

2  recommended by Eric's private therapist that he attend a school like CEDU. (Test. Of KR, Vol.

3  II, p. 00252, lines 9-22.)

4

5      KR complied with the juvenile court's order and enrolled Eric in the Ascent Program.

   (Vol. VI, p. 01330-01331.)

6

7      The Clinician at Ascent diagnosed Eric with:

8          **"Axis I:    Oppositional Defiant Disorder;**

9                       **Social Phobia with panic attack;**
                       **Stuttering, silent blocking and**

10                      **circumlocutions;**
                       **Cannabis Abuse;**

11                      **R/O Learning Disorder**

12          **Axis II:   Deferred**

13
           **Axis III:  None**

14
           **Axis IV:   Problems    with    primary**

15                      **support group, discord with**
                       **family, separated from family,**

16                      **inadequate   adjustment   in**
                       **home, <u>school</u> and community,**

17                      **<u>academic</u>**

18                      **<u>problems</u>**....(emphasis added.)

19          (Vol. VI, p. 01331.)

20

21      The District's Director of Special Education, Marvin Meyers, did not believe that the

22  District was obligated to take any action with regard to Eric's placement and services during the

23  time he was on probation.  (Testimony of Director of Special Education, Marvin Meyers, Vol.

24  III, p. 00477, lines 9 through 17.)

25      Both of the Behavior Support Plans (BSP) written into the November 12, 2002, IEP

26  document, and the November 13, 2003, IEP document, state that a referral to County Mental

27  Health would be made if the BSP was not successful in modifying Eric's behavior.  ("Referral to

28                                      13

1   County Mental Health") ("Parent initiated private therapist of County Mental Health.")  (Vol. VI,

2   01249, Vol. VI, 01280.)

3       The District did not assess or refer Student for an evaluation of Student's needs for

4   mental-health services at any time that he attended Hillsdale High School. (Test. Of J. Hahn,

5   Vol. IV, p. 00751, lines: 15 to 17; Test. of KR, Vol. II, p. 0247, lines: 19-24, p. 00248, lines 12-

6   14.)

7       Student required mental-health services in order to benefit from his education.  (Test. of

8   Patrick Conway, Vol. IV, p. 00773, lines: 7-15; p. 00774, lines: 24-25, p. 00775, line: 3; Test. of

9   Steven Moore, Vol. II, 00382, Test. Of Brandon Moffitt, Vol. III, p. 00544.)

10      The District's Communication Log Notes reflect that Eric went to CEDU Ascent

11  Program in Idaho, then to Rocky Mountain Academy through Summit.

12      KR, a single parent, made arrangements to borrow money for Eric's tuition at the Court

13  Ordered placements. (Test. Of KR, Vol. II, p. 00284, Lines 18-25, 00285-00287, Lines:1-25.)

14      KR believed it would be futile to request that the District provide Eric an appropriate

15  program when she was required to comply with the San Mateo County Juvenile Court's order

16  because she had been asking the District for help and a change, and Eric's program never

17  changed. (Test. Of KR, Vol. II, p. 00325, lines 9-14.)

18      Steve Moore was Eric's instructor at Ascent.  Steve Moore holds a Master's degree in

19  Counseling and is a Licensed Clinical Professional Counselor (LCPC) (Vol II, p. 00375, lines

20  19-24.)

21      From March 22, 2004, through May 5, 2004, Eric participated in a wilderness program

22  that included academics such as 90 hours of physical education, 40 hours of home economics,

23  120 hours of group and individual counseling, 80 hours of wilderness training and 80 hours of

24  English (Vol. Vi, p. 01411.)

25      While attending Ascent, Eric made progress with his maladaptive behaviors (Test. of

26  Steve Moore, M.Ed.LCPC, Vol. II, p. 00384, lines: 8-25; p. 00385, lines: 1-7.)

27      Eric made progress with his social/emotional growth that allowed him to benefit from

28

1  academic lessons while at Ascent.  Math lessons were incorporated into the program in the

2  naturalistic environment, i.e., calculations of time to complete tasks, etc.  (Test. of Steven Moore,

3  Vol. II, p.00384, lines: 8-25, p. 00385, lines: 1-7.)

4      Eric successfully completed the Ascent Therapeutic Adventure Program (referred to as

5  The Rocky Mountain Academy) and was Court ordered to a residential CEDU High School in

6  San Bernadino County on May 6, 2004.  (Vol. VI, p. 01301.)

7      Eric was transferred to the second phase of the CEDU program in Running Springs,

8  California, a California non-public school, via Court Order . (Vol. VI, p. 01391)

9      Eric's grades were all A's, B's and C's while attending CEDU and earned a 2.60 GPA.

10  Eric spent approximately 10 months at CEDU.  (Vol. VI, p.01335.)

11      CEDU High School closed down on March 25, 2005, while Eric was still a student there.

12  (Vol. VI, p. 01333.)

13      Eric was sent home while an appropriate placement was located.  Eric's probation officer

14  noted in her report that: **"No public or private schools met his needs in this area."** (Vol. VI, p.

15  01296.)

16      The juvenile court ordered Eric to attend Mt. Bachelor Academy in Pineville, Oregon

17  commencing May 11, 2005.  (See Court Order, (Vol.  IV, p. 01304 in conjunction with 01296.)

18      Eric was assessed by Patrick Conway, Ed.D. in August, 2005, to determine the

19  appropriateness of Mt. Bachelor Academy and obtain Eric's present levels in academics and his

20  social/emotional functioning.  (Vol. VI, p. 01372-01382.)

21      Eric's earned all As, Bs and Cs and made progress in the social/emotional area while a

22  student a Mt. Bachelor Academy.  (Vol. VI, pp. 01360-01366, p. 01367, 01370-01371, 01383-

23  01389; 01398, 01399, 01400, 01404.)

24      Mt. Bachelor Academy met Eric's needs for mental-health services. (Test. Of Brandon

25  Moffitt, Vol. III, p. 00541, lines: 10-25 through p. 00542, lines: 1-25.)

26      Eric graduated with a High School Diploma from Mt. Bachelor Academy in June, 2006

27  (Vol. VI, p. 01401.)

28

1    Eric is now a productive member of society.  He attends San Francisco City College and

2    works part-time in a grocery store.  (Test. Of KR, Vol. II, p. 0289, lines: 11-23.)

3

4                                    **LEGAL ARGUMENT**

5

6    **I    A SCHOOL DISTRICT CANNOT ESCAPE ITS OBLIGATION TO PROVIDE A
         FREE, APPROPRIATE PUBLIC EDUCATION TO A LEARNING-DISABLED
7        STUDENT SIMPLY BECAUSE THE STUDENT HAS BEEN MADE A WARD OF
         THE COURT**

8

9        A. AT ALL RELEVANT TIMES HEREIN, PLAINTIFF WAS ENTITLED TO A
            FAPE, INCLUDING THE TIME PERIOD THAT HE ATTENDED COURT-
10           ORDERED SCHOOLS PURSUANT TO THE IDEA, TITLE  34, CFR, § 300.2
            AND *COUNTY OF LOS ANGELES V. JOANNE SMITH*, 74 Cal.App.4th 500 (1999)

11

12           **The IDEA "was intended to ensure that children with**

13           **disabilities receive and education that is both appropriate and**

14           **free."**  (*Florence County School District 4 v. Carter*, 510 U.S.

15           7,12.)

16

17       Title 34 CFR 300.2 guarantees children with disabilities a free, appropriate public

18   education regardless of whether or not the juvenile court has made the placement or an IEP team

19   has made the placement:

20               **"...all states receiving funds, as does California, to comply with
                 Individuals with Disabilities Education Act and its regulations
21               provides: ...(a) States.  The provisions of this part–(1) Apply to
                 all political subdivisions of the State that are involved in the
22               education of children with disabilities, including (1) The State
                 Educational Agency (SEA) (ii) Local Educational agencies
23               (LEA), educational, service agencies (ESAs)...(iv) State and
                 local juvenile and adult correctional facilities.  Each public
24               agency in the state is responsible for ensuring that the rights
                 and protections under Part B of the Act are given to children
25               with disabilities (1) referred to or placed in private schools and
                 facilities by that public agency."** *County of Los Angeles v. Joanne
26               Smith*, 74 Cal.App.4th 500 (1999). *Id.* at 513.

27

28
                                          16

1    In *County of Los Angeles*, the County was funding a residential placement for a disabled

2   child eligible for an IEP.  The County sought reimbursement from the child's mother for the cost

3   of the placement.  The court stated that the child, who was a ward of the court, was entitled to a

4   free, appropriate public education ("FAPE") and that the County was not entitled to

5   reimbursement.  The child had been placed in the residential facility by the probation department.

6

7    **As noted previously, a child subject to an individualized**
     **education program is entitled to an appropriate public**
     **education."**  (20 U.S.C. § 1400(c).)  *County of Los Angeles, supra.*
8    *Id.* at 518**. (Emphasis added.)

9

10    In a case with similar facts to the case herein, *In re JOHN K., a Minor, RICHARD LA*

11   *POINTE, as Superintendent, etc., et al, Plaintiffs and Respondents, v. JOHN K., a Minor, etc. et*

12   *al. Defendants and Appellants; WILSON RILES, as State Superintendent, etc., Defendant and*

13   *Respondent*, 170 Cal.App.3d 783 (1985), the Court of Appeal of California  ruled that the school

14   District had financial responsibility for the cost of a student's residential placement since the

15   public high school that the child was attending, pursuant to his IEP, become entirely

16   inappropriate for him and the District did nothing to alter the student's program:

17    **"A pattern of chronic truancy and troublemaking had now**
     **become evident.  Moreover, the school district had been fully**
18    **cognizant of John's severe behavioral problems since early**
     **1978, but did nothing to alter his placement during the 1977-**
19    **1978 school year.  Nor did the district respond to the clear**
     **necessity for a change in placement in the fall of 1978.  Despite**
20    **the palpable need for a reassessment of John's placement and**
     **development of an appropriate IEP, respondents took no**
21    **remedial steps.  As a result, John languished in the juvenile**
     **court system without effective educational placement.**  *John K.*,
22    supra, *Id.* at 796.

23    **Respondents contend that John's chronic truancy and status as**
     **a ward of the juvenile court prevented his being reassessed and**
24    **so absolved the district from responsibility for providing John**
     **with an appropriate education.  But the law does not abandon**
25    **handicapped children to the jurisdiction of juvenile**
     **authorities.  According to 20 United States Code section**
26    **1412(6), a state educational agency must provide "educational**
     **programs for handicapped children" in compliance with the**
27    **Act, "including all such programs administered by any other**
     **State of local agency..."  Certainly Congress did not intend to**

28

**suspend the right of incarcerated handicapped children whose very disabilities render appropriate treatment difficult.** (citation omitted**.**) *Id.* at 796.

In this case, the District also contends that Eric was not present at school enough to be reassessed and formulated his October 4, 2002, May 1, 2003, and November 13, 2003, IEPs without assessing his present levels of performance.  Eric's mother wrote to Marvin Meyers, Director of Special Education for the District, on April 8, 2003, requesting a change of placement due to Eric's deteriorating behavior.  The IEP team convened on May 1, 2003, and again on November 13, 2003, and did nothing to alter Eric's educational program. The District did not offer any new services, and in fact, the District actually eliminated his direct speech therapy altogether because he was truant so often.  The District was fully cognizant of Eric's inability to make progress within the current program and did nothing.

Eric was made a ward of the court and placed on house arrest and ordered to attend school until an appropriate placement could be identified by probation.  The District was aware that Eric was being ordered to an out-of-state placement and sat idly by.   The San Mateo County Juvenile Court ordered Eric to attend Ascent (originally, the order stated: Rocky Mountain Academy, but it was later determined that Ascent was the placement) on March 4, 2004.

On May 6, 2004, Eric was ordered by the juvenile court to attend CEDU Academy in Running Springs, California.  CEDU ceased to operate 10 months later, and Eric was ordered by the court to attend Mt. Bachelor Academy beginning on May 11, 2005.  At all times, Eric's mother, complied with the juvenile court's orders and ensured Eric's attendance at the court-ordered placements.

Director of Special Education, Marvin Meyers, testified that the District had no obligation to Eric.  He testified that, although District personnel were aware that Eric was being placed in a "behavior" school, the District was under no obligation to do anything with regard to Eric's education because he was being placed by probation.

Mr. Meyers' statements and the District's inaction are contrary to well-settled law.  A district may not escape its obligations to students residing within their jurisdictional boundaries

18

1    simply because the student has become a ward of the court.  The court addressed this very point in

2    *John K., supra*:

3        **John's status within the juvenile court system was well-known
to respondents who nonetheless failed to undertake diagnostic**

4    **reassessment and placement process between February 1978
and at least January 1979.  Meanwhile, despite the woeful**

5    **inadequacy of his placement at Campolindo, John was neither
give an IEP nor reassessed after September 1977.  The failure of**

6    **the district in this respect clearly violated 34 Code of Federal
Regulations section 300.343, which requires "annual review of**

7    **the IEP."** *(Doe v. Anrig, supra*, 561 F.Supp. 121, 128, italics
added.)  *John K., supra., Id.* at 796,797.

8

9        Here, the SMHUSD failed to reassess Eric from October, 2002, through the time he was

10   ordered to the residential schools by the juvenile court.

11       In *Mrs. B., M.M. v. Milford Board of Education* (103 F.3d 1114 1997), the Second

12   Circuit Court of Appeals determined that if a student was only properly educable in a residential

13   placement, the school district was required to reimburse her parents the costs of the residential

14   placement, including room and board, along with the therapeutic component of the placement,

15   and not just the educational portion of the program.

16

17       **The fact that a residential placement may be required to alter a
child's regressive behavior at home as well as within the**

18   **classroom, or is required due primarily to emotional problems,
does not relieve the state of its obligation to pay for the program**

19   **under federal law so long as it is necessary to insure that the
child can be properly educated.** (citations omitted**.**) *Mrs. B., M.M.*

20   *v. Milford Board of Education* (103 F.3d 1114 1997.) Id. at 1112.

21       District personnel knew that Eric was not making progress in their program from October,

22   2002, through the time he was ordered to an out-of-state placement by the juvenile court and did

23   nothing to offer him an appropriate educational placement.

24       The District did not hold an IEP meeting after Eric's annual IEP to address his truancy and

25   other behaviors of November 13, 2003.  The District never assessed Eric and did nothing to alter

26   his IEP.

27       The facts in this case are aligned with *John K., supra*:

28

1

> **Faced with the fact of a manifestly inappropriate placement, respondents took no action. Indeed, even after John was suspended from Campolindo in October of 1978, for reasons which spoke eloquently of the need for reassessment of his status, no new placement was considered, let alone devised. ...Not only did he not receive a new IEP or placement, but respondents never attempted to compel his attendance at Campolindo.** *John K., supra., Id.* at 797.

Although the District was clearly aware of Eric's truancy and behavioral problems, they also did nothing to compel Eric's attendance at school.

*In Jeremy Magyar, by and through his father, Steven Magyar, v. Tucson Unified School District*, 958 F. Supp. 1423 (1997), one of the two issues before the court was whether or not a school district must reimburse a parent that pays privately for a placement made pursuant to a juvenile court's order. In *Magyar*, the court cited the juvenile court order as follows:

> "**The juvenile court order states in relevant part that Jeremy:**
>
> **Be placed on official probation for a period of one year…under the care, custody and control of Steven Magyar, subject to the supervision of the Probation Department, under the following terms and conditions of Juvenile Intensive Probation Supervision:**
>
> **Reside at Vision Quest residential Treatment cooperate and participate in all aspects of the program.**" *Id.* at 1431.

In *Magyar*, the student's father and the juvenile court were underwriting the placement at Vision Quest (which had no academic component to it.) The District did not undertake an evaluation or review of the student's educational placement. The court stated that:

> **The Court finds that as a direct result of its negligence,**

20

1
2
3

>**Jeremy Magyar is not receiving the special educational services to which he is entitled under the IDEA. The Court will place the burden on the District to take steps to ensure that Jeremy is evaluated and appropriate IEP implemented.**

4
5
6
7

>**This complete failure to provide special education services for this child is unconscionable and Steven Magyar is entitled to an award of compensatory education.** *See Parents of Student E. v. Puyallup Sch. District.,* **31 F.3d 1489, 1497 (9th Cir. 1994). Compensatory education is an equitable remedy.** *Id.*

8
9
10
11
12
13
14
15

Here, Eric's mother was ordered to fund the placements that were ordered by the San Mateo County Juvenile Court. The District did nothing to evaluate or offer Eric an appropriate placement before, during or after his court-ordered placements. KR had requested assistance, from the District, for months leading up to his court-ordered placements. At the time she funded Eric's program pursuant to the Juvenile Court's order, she was not aware that the District could have, and should have, intervened with an appropriate evaluation and an appropriate offer of placement

16
17

**II    THE DISTRICT DENIED ERIC A FAPE DURING THE TIME ERIC ATTENDED ITS HIGH SCHOOL LEADING UP TO THE COURT-ORDERED PLACEMENTS**

18
19
20

A. THE DISTRICT DENIED PLAINTIFF A FAPE WHEN IT FAILED TO ASSESS PLAINTIFF'S NEEDS IN THE AREA OF BEHAVIOR DESPITE THE DISTRICT'S KNOWLEDGE THAT ERIC'S BEHAVIOR WAS THE IMPEDIMENT TO HIS LEARNING

21
22
23
24

The District denied Plaintiff a FAPE when it failed to assess and offer services and/or a Behavior Intervention Plan to address the behavior that interfered with Eric making any progress on his goals.

25

The court stated in *John K., supra* that a district cannot simply do nothing:

26
27

>**That John's problems were formidable and extremely difficult for diagnosis and treatment does not extenuate respondents' long period of inaction.** *Id.* at 797.

28

1

2

3

4

5

6

7

8

9

10

11

> **But given the above evaluations of this child, how can knowledgeable group of educators in good conscience, fairly conclude that the knife incident did not relate to Jeremy's chronic inability to have "satisfactory interpersonal relationships or to his inappropriate behavior or to his strong conduct disorder?  The more sound conclusion is that Jeremy's IEP in effect at the time of the incident was *not* appropriate.  Children with emotional disabilities are impulsive and may have little physical control over their actions.** (citations omitted.) **They may have learned maladaptive responses to social situations."..That certainly may have been the case with Jeremy.   With his history of behavioral problems and suspensions, its obvious that his emotionally handicapped needs were unmet.  What should have occurred during the nine day short term suspension, was anew IEP conference.  Surely, it was obvious to Jeremy's teachers, both special and regular, to the school psychologist and to the school administrators, Jeremy's then-current educational program was failing.  A central tenet of Jeremy's IEP should have incorporated a treatment program for his behavior problems as well as focused on his proof academic skills.**  (*Maygar*, *Id.* at 1445.)

12

13

14

15

16

17

18

19

20

21

22

Similar to the facts in this case, District personnel knew that Eric's program was not allowing him to progress academically or socially.  They wrote it in his IEP, yet did nothing to change his program to meet his needs in the areas of behavior.  To repeatedly acknowledge that a disabled student is failing and truant, disruptive and willfully disregarding the valid authority of school personnel and do nothing to offer that student services to allow him to benefit from his education, is unconscionable.  Finally, when Eric ends up in the Juvenile Court system, the District continued to fail him by sitting idly by and left his mother to struggle with the costs of providing her son an appropriate placement.  The District's denial of a FAPE to Eric has left KR with a financial liability of over $180,000.00.  The IDEA was enacted to prevent this very type of ruin to a family of a learning-disabled child.

23

24

25

26

B.  THE NOVEMBER 12, 2002, (THE OPERATIVE IEP DURING THE STATUTORY PERIOD - FROM JULY, 2003) WAS DRAFTED WITHOUT UPDATED EVALUATIONS OF ERIC'S PERFORMANCE AND ACADEMIC LEVELS AND WITHOUT EVALUATING ERIC'S BEHAVIORAL NEEDS THEREBY DENYING ERIC A FAPE

27

28

On November 12, 2002, at Eric's annual IEP meeting, Resource Teacher, Pam Rianda

22

1 presented to Eric's mother, Kim Rodriguez, an Assessment Plan that offered an "Environmental

2 Assessment" to be administered to Eric in order to write a Behavior Support Plan. **At the same**

3 **time** KR's signature, for consent, was obtained for an "Environmental Assessment", the BSP

4 that was to flow from the "Environmental Assessment" to address behaviors identified in the

5 assessment was drafted and also presented to the parent for consent.  District personnel never

6 conducted the "Environmental Assessment."  The District IEP team members simply drafted a

7 BSP without assessing how Eric's undesirable behaviors were functioning for him.

8 The District was required to obtain Eric's present levels of performance and draft

9 appropriate goals for his annual IEP, but failed to and composed an educational plan without the

10 essential elements.

11 Further, the BSP form itself states that if the BSP does not work, a referral to County

12 Mental Health will be made.  The plan was not successful and Eric's behavior deteriorated and

13 continued to impede his ability to benefit from his education, yet, no referral to County Mental

14 Health was ever made.

15

16 C. THE MAY, 2003, IEP-TEAM DID NOT INCLUDE THE APPROPRIATE PROFESSIONALS TO ADDRESS ERIC'S BEHAVIORAL AND MENTAL-HEALTH NEEDS

17

18 In May, 2003, the District held an IEP meeting for Eric.  The IEP team was not complete

19 pursuant to California Education Code § 56341 (5) in that the IEP meeting was requested by

20 Eric's mother to address a potential change of placement due to his behavior.  Despite the fact

21 that Ms. Rodriguez was requesting an IEP meeting to address Eric's behavior, neither a school

22 psychologist, nor an individual with qualifications in behavior modification was present at the

23 IEP team meeting.

24 The District denied Eric a FAPE when it failed to constitute an appropriate IEP team.

25 The District did not address Eric's continued truancy.   Although Eric had a Behavior

26 Support Plan, it did not address the behaviors that were interfering with Eric's success at school,

27 i.e., truancy, resulting in a denial of a FAPE.

28

D. THE DISTRICT DID NOT OFFER ERIC DIRECT SPEECH-LANGUAGE
THERAPY DESPITE HIS SPEECH PATHOLOGIST'S IDENTIFYING THAT
NEED RESULTING IN A DENIAL OF FAPE

Eric's Speech Language Pathologist wrote in the report that she presented at Eric's

November 13, 2003, IEP meeting that:

> **Although Eric continues to be eligible for DIS speech services as
> part of his IEP, the delivery of those services has been
> compromised by his inability or refusal to attend school
> regularly. The nature of stuttering therapy requires consistent
> effort. Specific recommendations regarding services will be
> developed with the input of the IEP team.**

Speech-Pathologist, Lisa Fox, testified that had Eric attended school regularly, she would

have seen him weekly for therapy, but since he was not attending school, she did not recommend

the level of services that he actually needed i.e., consistent, regular speech language therapy for

his dysfluency. She testified that Eric's attendance never improved to the point of putting him

on a regular schedule for speech-language therapy. Thus, only an offer of speech consultation,

for 1 year, with no frequency specified was written on Eric's November 13, 2003, IEP and

offered to Eric's.

The District personnel's conduct in this regard resulted in a denial of FAPE to Eric in that

they failed to address the behaviors interfering with his learning. The failure to address Eric's

truancy also caused the speech therapist to change her recommendations to something less than

what his needs required, resulting in a further denial of FAPE when the District, at the November

13, 2003, IEP meeting offered consult only for speech therapy when Eric clearly required direct

service.

Further, the District failed to offer what Eric required in order to benefit from his

education, i.e., direct speech therapy to address his stuttering, because they did not believe that

he would avail himself of the offered therapy. This action by the District was a denial of an offer

of a FAPE to Eric.

E.    THE DISTRICT DENIED PLAINTIFF A FAPE WHEN IT FAILED TO PROVIDE PLAINTIFF WITH MENTAL-HEALTH SERVICES

> **"If an individual with exceptional needs is identified as potentially requiring mental health services, the local educational agency shall request the participation of the county mental health agency in the individualized education program, including related services such as counseling services, parent counseling and training, psychological services, or social work services in schools as defined in Section 300.24 of Title 34 of the Code of Federal Regulations...."** (Cal. Ed. Code § 56331 (b).)

> **Congress noted that in the school year prior to the passage of the IDEA, the educational needs of 82% of all emotionally disabled children were unmet. (citations omitted.)** *Magyar, supra. Id.* at 1435.

When Plaintiff's behavior and emotional status deteriorated and continued to impede his ability to learn as evidenced by the notes from the IEP documents and Eric's grades and attendance record, the District IEP-team members had an obligation to refer Eric for County Mental Health Services.  The District failed to address Eric's mental-health needs that were interfering with his progress at school and on his goals thereby depriving Eric of a FAPE. Additionally, on both BSPs, it states that a referral to County Mental Health will be made if the BSPs drafted fails to improve student's behavior.  The District failed to follow its own plan.

All mental-health professionals from the private placements and Dr. Conway, testified that Eric required mental-health services in order to benefit from his education.  Eric received mental-health services in the court-ordered placements.

The District denied Plaintiff a FAPE when it failed to provide or refer Plaintiff for mental-health services.

F.    THE DISTRICT DENIED ERIC A FAPE WHEN IT FAILED TO CONSTITUTE A COMPLETE IEP TEAM THAT INCLUDED A SCHOOL PSYCHOLOGIST AT ANY OF THE THREE IEP MEETINGS HELD

California Code of Regulations, § 3052 mandates that:

(1)     **An IEP team shall facilitate and supervise all assessment, intervention, and evaluation activities related to a individual's behavioral intervention plan. When the behavioral intervention plan is being developed, the IEP team shall be expanded to include the behavioral intervention case manager with documented training in behavior analysis including positive behavioral intervention(s),m qualified personnel knowledgeable of the student's health needs, and others as described in Education Code Section 56341(c)(2). The behavioral intervention case manager is not intended to be a new staff person and may be an existing staff member trained in behavior analysis with an emphasis on positive behavioral interventions.**

(2)     **Behavioral intervention plans shall only be implemented by, or be under the supervision of, staff with documented training in behavior analysis, including the use of positive behavior intervention. Such interventions shall only be used to replace specified maladaptive hevavior(s) with alternative acceptable behavior(s) and shall never be used solely to eliminate maladaptive behavior(s).**

(3)     **Behavior intervention plans shall be based upon a functional analysis assessment, shall be specified in the individualized education program, and shall be used only in a systematic manner in accordance with the provisions of this section.**

Throughout Eric's time at Hillsdale High School, three (3) IEP meetings were held: November 12, 2002, May 1, 2003 and November 13, 2003. A school psychologist never attended any of the meetings, despite the fact that Eric's behavior was a major concern to all of the team members.

The IEP team on November 13, 2003, consisted of two Special Education teachers, Ms. Rianda and Ms. Hahn, a general education teacher, a Speech Language Pathologist and an LEA Administrator along with Eric and his mother.

The "team" then proceeded to modify Eric's BSP from November, 2002, by adding the behavior of truancy (the November, 2002, BSP was prepared without an assessment and the modified BSP was also changed without assessing Eric's behavioral needs or the functions of his maladaptive behaviors.) The team did not include any individuals with experience and training in behavior modification as required by the California Code of Regulations, § 3052.

1    The November 13, 2003, BSP reflected that the behavior to be corrected was Eric's

2    truancy, but did nothing to address his truancy.  Both Eric's mother and SDC teacher testified

3    that when Eric was not in class, they telephoned him on his cell phone and told him to go to

4    class.  This reaction to truancy did nothing to replace Eric's maladaptive behavior of skipping

5    classes and did not prevent the undesirable behavior of truancy.

6    Had a school psychologist been present at Eric's annual IEP meetings, with training in

7    Behavior Intervention Plans, there may very well have been a changed in Eric's IEP and

8    accompanying BSP or an Functional Behavior Assessment performed with a resulting Positive

9    Behavior Intervention Plan.

10    The testimony of the assigned school psychologist at the administrative hearing on this

11    matter, who did not attend any of Eric's IEP meetings, testified that she did not know what a

12    Functional Behavior Assessment.

13    The District denied Plaintiff a FAPE when it failed to constitute an adequate and

14    complete IEP team that included a professional with behavioral modification training resulting in

15    a denial of a FAPE for Plaintiff.

16

17    G.    THE DISTRICT DENIED ERIC A FAPE WHEN IT FAILED TO ASCERTAIN
            ERIC'S PRESENT LEVELS OF FUNCTIONING PURSUANT TO CAL. ED.
            CODE 56345 (1) AND 20 USC 1414 (d)

18

19    California Education Code § 56345 (1) and 20 USC § 1414 (d) require that the IEP

20    contain a statement of the individual's present levels of academic achievement and functional

21    performance.

22    **The individualized education program is a written statement
      for each individual with exceptional needs that is developed,**

23    **reviewed, and revised in accordance with this section, as
      required by subsection (d) of Section 1414 of Title20 of the**

24    **United States Coe, and that includes the following:**

25    * * *

26    **(2)    A statement of measureable annual goals, including
      academic and functional goals, designed to do the following:**

27

28    **(A)    Meet the individual's needs that result from the**

27

**individual's disability to enable the pupil to be involved in and make progress in the general curriculum.**

The IEP of November 13, 2003, contains an Assessment Information/Present Level of Performance Report by Resource Specialist Teacher, Jessica Hahn wherein she states that since Eric does not attend school on a regular basis, she was not able to ascertain his present levels of performance:

**"Current testing has not been performed due to excessive absences.  Please see academic assessment from Eric's last annual IEP. "**

The failure of District personnel to assess Eric's academic levels was a denial of FAPE in that:

1)  It is impossible to determine if the goals proposed adequately address a student's academic needs; and,

2)  It is impossible for a parent to determine if the program offered will meet the student's needs, thereby denying parent participation in the IEP process.

Parent participation is impossible under the circumstances presented here since a parent would have no way of determining if the current program and the offered program (in this case it is the same program) met her child's needs.  Although, in this case, it was clear Eric was not benefiting from his IEP, his mother was entitled to have an understanding of his present levels of performance.   Eric was entitled to have goals drafted that addressed his present levels of performance.  Both elements of an IEP were missing from Eric's program.

The District denied parent participation in the IEP process by not informing Plaintiff's mother of her son's present levels and current needs, thereby denying Plaintiff a FAPE.

The District failed to provide Plaintiff with a FAPE when it failed to assess Plaintiff and share information necessary for Plaintiff's mother to make meaningful decisions with regard to Plaintiff's placement and services.

III    **PLAINTIFF'S MOTHER IS ENTITLED TO REIMBURSEMENT OF ALL COSTS INCURRED BY HER RELATING TO PLAINTIFF'S EDUCATION FROM FEBRUARY, 2004, THROUGH JUNE, 2006, PURSUANT TO *JOHN K. v.***

**WILSON RILES**, 170 Cal.App.3d 783

1

2    This case is analogous to, In re *JOHN K., supra* wherein the court stated that the school

3    District had financial responsibility for a student's residential placement, due to the fact that the

4    public high school became entirely inappropriate and the District did nothing.  In that case, the

5    student was also a ward of the court.  The court awarded the student's parents reimbursement for

6    the private placements.    The court-ordered schools provided Plaintiff with an appropriate

7    education pursuant to the documentary evidence, testimony of the witnesses, and testimony of

8    the expert witnesses, in this matter.

9

10    **Parents have an equitable right to reimbursement for**
     **the cost of providing an appropriate education when a**
11    **school district has failed to offer a child a FAPE.  *School***
     ***Comm. v. Dept. of Educ., 471 U.S. 359, 105 S. Ct. 1996,***
12    ***85 L. Ed. 2d 385 (1985)*. The conduct of both parties**
     **must be reviewed to determine whether relief is**
13    **appropriate.**  *Alamo Heights Indep. School Dist. v. State*
     *Bd. of Educ., 790 F.2d 1153 (5th Cir. 1986). Id.* at 1486.
14

15

16    The fact that KR did not give written notice to the District that she would seek

17    reimbursement is not fatal to this claim.  In this case, KR had requested a change of placement in

18    May, 2003, and her request was completely ignored and Eric was left to fail in an inappropriate

19    program.    The District allowed Eric to languish in an inappropriate program since the

20    commencement of his high school years.  Once the juvenile court stepped in, Eric was then

21    completely abandoned by his school district.

22

23    Further, once Eric was made a ward of the court and in her custody, KR was led to

24    believe that the probation officer and juvenile court would determine Eric's placement and was

25    misled by the juvenile court that she was required to fund Eric's residential educational

26    placements ordered by the court.  Had KR provided notice to the District that she would seek

27    reimbursement for costs that she was ordered to pay by the juvenile court, it could be viewed as a

28

violation of the court order.

Plaintiff's program at Ascent included English, Home Economics, Physical Education and Counseling. Steve Moore, M.Ed., of Ascent testified that Plaintiff made progress in his behavior during his time there and without the progress in behavior, Eric would not have been able to benefit from any academic lessons at Ascent or any other placement in the future.

Mr. Moore was familiar with the program and curriculum that was delivered by CEDU in Running Springs, California and opined that CEDU was an appropriate placement for Plaintiff to attend once he graduated from the Ascent Program. Plaintiff complied with the juvenile court's order and attended CEDU. Eric made progress, earned high school credits while a student at CEDU and benefited from attending that program.

Brandon Moffit, who holds a Masters' degree in counseling, of Mt. Bachelor Academy, testified that Eric made great strides in his maladaptive behaviors and his academic lessons at Mt. Bachelor Academy and was appropriately placed there.

Expert, Patrick Conway, M.Ed. assessed Eric in August, 2006, as part of Mt. Bachelor's program and determined Eric's present levels of academic functioning and his social/emotional functioning. Dr. Conway was familiar with Mt. Bachelor Academy since worked as a consultant to the school and had evaluated many other students attending. Dr. Conway opined that Mt. Bachelor was an appropriate placement for Eric's academic, social/emotional and mental-health needs.

Since the District denied Eric a FAPE from July, 2003, through the date he graduated in June, 2006, his mother is entitled to reimbursement for all costs incurred by her to provide Eric with an appropriate education.

**VIII    CONCLUSION**

The Individuals with Disabilities Education Act was written to protect learning-disabled students' rights to an education. When the IDEA's predecessor, the Educational for

1   Handicapped Act, was written, learning-disabled children were sitting home, on the streets, or

2   incarcerated at a disturbing rate.  The EHA, then IDEA, was enacted to prevent exactly what

3   began to occur in this case: Eric's introduction to the penal system and a school district's

4   complete abandonment of its student.  Unless this court grants relief, KR will be left with the

5   burden for paying for Eric's education because the orders of the Juvenile court misled KR as to

6   her rights against the District and the District quietly ignored its obligation to provide Eric with

7   an appropriate placement and services from July 2003, through June, 2006.

8       When one public entity, in this case, the San Mateo County Juvenile Court orders a

9   learning-disabled child, that is entitled to all of the rights of the IDEA to a residential

10   treatment/educational center, that child is not usurped of his rights under the IDEA.  Since Eric

11   was never incarcerated and was at all times relevant, a resident of the SMUHSD, the SMUHSD

12   is responsible for his education and/or the costs of his education.

13       Eric is entitled to compensatory education for that time period, and the only equitable

14   remedy in this case would for the District to reimburse his mother for all funds she expended to

15   provide Eric with the appropriate services that he required and the court ordered in order to

16   become an independent, functional member of society.

17       The juvenile court impliedly found that the District's placement was not appropriate

18   when it ordered a different placement in March, 2004.  The ALJ should not have found to the

19   contrary and forced Eric's mother to defend actions which were not her own, but those of the

20   juvenile court.

21       Since the District failed to offer and provide a FAPE to Eric during the 2003-2004 school

22   year through June, 2006, his mother is entitled to reimbursement of all costs incurred as a result

23   of his attendance at the court-ordered placements under compensatory education remedies.

24   DATED:     January 30, 2008    **LAW OFFICES OF SUSAN FOLEY**

25

26                    By__/S/  Susan Foley_____
                        SUSAN FOLEY, Attorney for Plaintiffs

27                             31

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28