Howard A. Friedman, SBN 61187
hfriedman@fagenfriedman.com
Kimberly A. Smith, SBN 176659
ksmith@fagenfriedman.com
FAGEN FRIEDMAN & FULFROST, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Phone: 323-330-6300
Fax: 323-330-6311

Attorneys for San Mateo Union High School
District

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

|  |  |
|---|---|
| ERIC RODRIGUEZ AND KIMBERLIN RODRIGUEZ,<br><br>        Plaintiffs,<br><br>vs.<br><br>SAN MATEO UNION HIGH SCHOOL DISTRICT,<br><br>        Defendant. | CASE NO. C 07-02360 PJH<br><br>**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT BY DEFENDANT SAN MATEO UNION HIGH SCHOOL DISTRICT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:        April 9, 2008<br>Time:       9:00 a.m.<br>Courtroom:  3<br><br>*Filed Concurrently With:*<br><br>1. Proposed Order |

/ / /

/ / /

/ / /

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

NOTICE OF HEARING (Civil L.R. 7-2(b)(2)) ................................................................1

RELIEF SOUGHT (Civil L.R. 7-2(b)(3)) .....................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES..................................................1

I.     INTRODUCTION ...................................................................................................2

II.    STANDARD OF REVIEW ....................................................................................2

     A.    Legal Standard ...........................................................................................2

     B.    Burden of Proof and Persuasion ...............................................................3

III.   STATEMENT OF FACTS .....................................................................................4

IV.   SCHOOL DISTRICTS ARE OBLIGATED TO PROVIDE ELIGIBLE
     STUDENTS WITH A FREE AND APPROPRIATE PUBLIC EDUCATION ................12

V.    THE DISTRICT PROVIDED ERIC WITH A FREE AND APPROPRIATE
     PUBLIC EDUCATION PRIOR TO HIS REMOVAL FROM THE DISTRICT ............13

     A.    The District Did Not Fail to Assess Eric's Behavioral Needs from July 19,
          2003 Though the 2005-2006 School Year......................................................13

          1.    An Environmental Assessment Was Not Required....................................15

          2.    An FBA or FAA Was Not Required .........................................................15

     B.    The District Did Not Fail To Meet Eric's Unique Behavioral and Mental
          Health Needs from July 19, 2003 through the 2005-2006 School Year. ................16

     C.    The Attendance of a School Psychologist at the November 13, 2003 IEP
          Was Not Required to Provide a FAPE. ....................................................19

     D.    The District Did Not Deny Eric a FAPE by Failing to Assess in the Areas of
          Behavior, Speech and Language and Academics. ....................................20

          1.    Academics.................................................................................................21

          2.    Speech and Language ...............................................................................22

     E.    The District Did Not Deny Eric a FAPE by Failing to Provide Adequate
          Present Levels of Performance in His November 13, 2003 IEP......................22

     F.    The District Did Not Deny Eric a FAPE by Failing to Include Adequate
          Goals in the November 13, 2003 IEP......................................................24

     G.    The District Did Not Deny Eric a FAPE by Failing to Meet His Speech and
          Language Needs...........................................................................................26

Defendant San Mateo Union High School District's Motion for Summary Judgment

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California  90048
Main: 323-330-6300  •  Fax: 323-330-6311

VI.    PLAINTIFFS ARE NOT ENTITLED TO REIMBURSEMENT FOR ERIC'S PRIVATE SCHOOL PLACEMENT AND RELATED TRANSPORTATION COSTS FROM MARCH 2004 TO JUNE 2006 ......................................................27

    A.    Plaintiffs Failed to Demonstrate that the District Denied Eric a FAPE. .................28

    B.    Plaintiffs Failed to Demonstrate that the Private Placements Were Appropriate. ...............................................................................29

    C.    Plaintiffs Failed to Provide the District with Adequate and Required Notice of Their Intent to Privately Place. ...........................................31

VII.    CONCLUSION ....................................................................................33

C 07-02360 PJH

Defendant San Mateo Union High School District's Motion for Summary Judgment

1

**TABLE OF AUTHORITIES**

2

**Page**

3   CASES

4   *Adams v. State of Oregon*, 195 F.3d 1141 (9th Cir. 1999) ........................................ 12

5   *B.B. v. Hawaii Dept. of Educ.,* 483 F.Supp. 1042 (D. Hawai'i 2006) ........................... 23

6   *Berger v. Medina City Sch. Dist.*, 348 F.3d 513 (6th Cir. 2003) ................................ 31

7   *Board of Educ. of the Hendrick Hudson Central Sch. Dist. v. Rowley)*, 458 U.S. 176,
    102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) ............................................... 3, 12, 24, 26

8
    *Board of Educ. For Oak Park and River Forest High Sch. Dist. v. Illinois State Bd.*
9   *of Educ. and Kelly E.,* 21 F.Supp.2d 862 (N.D. Ill. 1998) ...................................... 17

10  *Burlington v. Dep't of Educ.*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) ........... 27, 29

11  *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884 (9th Cir. 1995) ...................... 3

12  *Clovis Unified Sch. Dist. v. Office of Admin. Hearings*, 903 F.2d 635 (9th Cir. 1990) ........... 29

13  *Clyde K. v. Puyllup Sch. Dist. No. 3*, 35 F.3d 1396, 1399 (9th Cir. 1994) ........................ 3

14  *County of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458 (9th Cir. 1996) ......... 3

15  *Florence County Sch. Dist. v. Carter ("Carter")*, 510 U.S. 7, 114 S.Ct. 361,
    126 L.Ed.2d 284 (1993) ................................................................. 29
16
    *French v. Omaha Public Schools,* 766 F.Supp. 765 (Neb. 1991) ................................. 23
17
    *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307 (9th Cir. 1987) ........................... 3, 12
18
    *G.W. v. New Haven Unif. School Dist.*, 2006 W.L. 2237749 (N.D. Cal. 2006) ...................... 3
19
    *Hampton Sch. Dist. v. Charles Dobrowolski*, 976 F.2d 48 (1st Cir. 1992) ....................... 22
20
    *Miller v. San Mateo-Foster City Unif. Sch. Dist.*, 318 F.Supp.2d 851 (N.D. Cal. 2004) ........... 3
21
    *Ojai Unified Sch. Dist. v. Jackson*s, 4 F.3d 1467 (9th Cir. 1993) ............................. 22
22
    *Rebecca B. v. State of Hawaii*, 2006 WL 1737908 (D.Hawaii 2006) ............................. 31
23
    *Schaffer v. West*, 546 U.S. 49, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005) .......................... 3
24
    *Union Sch. Dist. v. Smith*, 15 F.3d 1519 (9th Cir. 1994) ...................................... 3
25

26

27

28

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main:  323-330-6300 • Fax: 323-330-6311

1

## FEDERAL STATUTES

2   20 U.S.C. §1400(d) ................................................................................................. 12

3   20 U.S.C. §1401(9) ................................................................................................. 12

4   20 U.S.C. § 1412(a)(10)(A)(i) ................................................................................ 21

5   20 U.S.C. § 1412(a)(10)(C) ..................................................................................... 28

6   20 U.S.C. § 1412(a)(10)(C)(iii) ............................................................................... 31

7   20 U.S.C. § 1414(a)(2) ..................................................................................... 13, 20

8   20 U.S.C. § 1414(a)(3) ..................................................................................... 13, 20

9   20 U.S.C. §1414(d)(1)(A)(i) ................................................................................... 22

10  20 U.S.C. § 1414(d)(1)(A)(i)(II) ............................................................................. 24

11  20 U.S.C. §1414(d)(1)(A)(iii) .................................................................................. 25

12  20 U.S.C. § 1414(d)(3)(B)(i) ............................................................................ 14, 16

13  20 U.S.C. §1415(f)(3)(E) .......................................................................... 12, 15, 24

14  20 U.S.C. § 1415(i)(2)(C) ......................................................................................... 2

15  20 U.S.C. § 1415(k)(1)(D) ...................................................................................... 14

16

## FEDERAL RULES, REGULATIONS

17  FED.R.CIV.PROC. 56 .................................................................................................. 1

18  FED.R.CIV.PROC. 56(c) ............................................................................................. 2

19  34 C.F.R. §§ 300.1 *et seq.* ..................................................................................... 12

20  34 C.F.R. §300.344(a) ............................................................................................. 19

21  34 C.F.R. § 300.346(a)(2)(i) .................................................................................... 14

22  34 C.F.R. § 300.347(a)(1) ........................................................................................ 22

23  34 C.F.R § 300.520(B)(1)(i) .................................................................................... 14

24  34 C.F.R. § 300.533(c) ....................................................................................... 13, 21

25  34 C.F.R. §300.540 ................................................................................................. 19

26

27

28

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

**STATE STATUTES**

Cal.Educ.Code § 56341 ............................................................................................ 19

Cal.Educ.Code § 56320(e) ................................................................................... 13, 20

Cal.Educ.Code § 56320(f) ............................................................................ 13, 17, 20

Cal.Educ.Code § 56331 ............................................................................................ 16

Cal.Educ.Code § 56341.1(b)(1) ............................................................................... 14

Cal.Educ.Code §56345(a)(1)(A) ............................................................................... 22

Cal.Educ.Code § 56345(a)(2) ............................................................................. 22, 25

Cal.Educ.Code § 56381 ............................................................................................ 21

Cal.Educ.Code § 56381(a) ................................................................................... 13, 20

Cal.Educ.Code § 56381(d) ................................................................................... 13, 21

Cal. Educ. Code § 56505(f) ............................................................................ 12, 15, 24

Cal.Gov.Code § 7576(b)(3) ...................................................................................... 17

Cal.Gov.Code § 7576(b)(5) ...................................................................................... 17

Cal.Penal.Code §484 .................................................................................................. 9

Cal.Wel.Code §602 .................................................................................................... 9

**STATE REGULATIONS**

Cal.Code.Regs., tit. 5, § 3000 *et seq.* ..................................................................... 14

Cal.Code.Regs., tit. 5, § 3001(aa) ...................................................................... 14, 16

Cal.Code.Regs., tit. 5, § 3001(f) ......................................................................... 14, 16

Cal.Code.Regs., tit. 5, § 3052(b) .............................................................................. 14

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

## NOTICE OF HEARING (Civil L.R. 7-2(b)(2))

PLEASE TAKE NOTICE that on April 9, 2008, or as soon thereafter as this matter may be heard, in Department 3 of the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California 94102, before the Honorable Phyllis J. Hamilton, defendant San Mateo Union High School District ("District") will and hereby does move pursuant to Federal Rule of Civil Procedure 56 for summary judgment as to Plaintiffs' complaint on the grounds that no genuine issues of material fact exist and that defendant is entitled to judgment in its favor as a matter of law.

## RELIEF SOUGHT (Civil L.R. 7-2(b)(3))

Defendant seeks full affirmation by this Court of the February 8, 2007 decision by Administrative Law Judge Suzanne B. Brown in the administrative case titled *Student v. San Mateo Union High School District,* OAH Case No. N2006070550.

DATED: January 30, 2008                FAGEN FRIEDMAN & FULFROST, LLP


                                       By:  /s/ Kimberly A. Smith
                                            Kimberly A. Smith
                                            Attorneys for San Mateo Union High School
                                            District

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

3   **I.**      **INTRODUCTION**

4         This action is an appeal from an administrative special education "due process" proceeding

5 before the Special Education Division of the California Office of Administrative Hearings

6 ("OAH"), pursuant to the Individuals with Disabilities Education Act ("IDEA"). Plaintiff, now an

7 adult, is a former student of the San Mateo Union High School District ("District") who qualified

8 for special education and related services under the categories of specific learning disability and

9 speech and language impaired. In the underlying due process proceeding, Plaintiff Eric Rodriguez

10 ("Eric" or "Student") alleged that the District failed to offer a free, appropriate public education

11 ("FAPE") as mandated by the IDEA and related California law during periods of the 2003-2004,

12 2004-2005 and 2005-2006 school years. Plaintiff further sought reimbursement for approximately

13 twenty-eight (28) months of tuition and related transportation costs at three private schools which

14 he attended as the result of a juvenile criminal conviction.

15         On February 8, 2007, OAH issued a decision in the District's favor on all issues. By their

16 appeal, Eric and his mother, Plaintiff Kimberlin Rodriguez ("Ms. Rodriguez" or "Mother") seek

17 reversal of the OAH decision and full reimbursement of Eric's private school tuition.

18

19   **II.**     **STANDARD OF REVIEW**

20      **A.**    **Legal Standard**

21         The Federal Rules of Civil Procedure provide for summary judgment when there is no

22 genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

23 FED.R.CIV.PROC. 56(c). In an appeal from the decision an administrative agency regarding the

24 rights of students with disabilities, the court receives the records of the administrative proceedings

25 which are, in essence, the undisputed facts of the case. The court must then review the record and,

26 basing its decision on the preponderance of the evidence, grant such relief as the court determines

27 is appropriate. 20 U.S.C. § 1415(i)(2)(C).

28

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

1    When reviewing an administrative decision, the court must give due weight to judgments

2    of educational policy.  *Bd. of Educ. of the Hendrick Hudson Central Sch. Dist. v. Rowley*

3    *("Rowley")*, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).  A court has discretion to

4    determine the amount of deference to give.  *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307,

5    1311 (9th Cir. 1987).  However, a court should accord greater deference to the administrative

6    findings of the hearing officer when the hearing officer engages in a thorough and careful analysis

7    of the issues.  *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994).  A court should also

8    give substantial weight to the decision when it evinces careful and impartial consideration of all of

9    the evidence and demonstrates the hearing officer's sensitivity to the complexity of the issues

10   presented.  *County of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458, 1466 (9th

11   Cir. 1996); *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995)

12   [increased deference should be given to findings that are "thorough and careful."].  After carefully

13   considering the findings of the hearing officer, the court may accept or reject them in part or in

14   whole.  *Gregory K.*, 811 F.2d at 1311.

### B.    Burden of Proof and Persuasion

16   At the administrative level, a petitioning party has the burden of proof.  *Schaffer v. West*,

17   546 U.S. 49, 126 S.Ct. 528, 537, 163 L.Ed.2d 387 (2005).  The party then challenging an

18   administrative decision in federal district court bears the burden of persuasion.  *G.W. v. New*

19   *Haven Unif. School Dist.*, 2006 W.L. 2237749 at *1 (N.D. Cal. 2006), *citing Clyde K. v. Puyllup*

20   *Sch. Dist. No. 3*, 35 F.3d 1396, 1399 (9th Cir. 1994).  It is axiomatic that "[t]he party challenging

21   the [administrative-level special education] decision bears the burden of persuasion on its claim"

22   in federal district court.  *Miller v. San Mateo-Foster City Unif. Sch. Dist.*, 318 F.Supp.2d 851, 859

23   (N.D. Cal. 2004), *citing Clyde K.,* 35 F.3d at 1399 (9th Cir. 1994).  In this case, all matters at issue

24   were resolved in favor of the District at the administrative level and there is no evidence in the

25   record or that Plaintiffs can otherwise present to warrant a different result in this forum.

26   / / /

27   / / /

28   / / /

III.    STATEMENT OF FACTS

Eric attended the District's Hillsdale High School ("Hillsdale") during the 2002-2003 school year and *a part of the* 2003-04 school year, as a freshman and sophomore respectively. [Administrative Record ("AR") 242:8-13; 251:17-18.] Eric qualified for special education and related services in third grade, under the eligibility categories of specific learning disability and speech and language impaired.  [AR 240:9; 241:11; 1268.][1]

In September 2002, Ms. Pam Rianda, Eric's special education teacher, conducted a number of triennial assessments.  Specifically, Ms. Rianda conducted a Wide Range Achievement Test ("WRAT"), a Bruckner diagnostic math test, and the Peabot Individual Achievement Test ("PIAT").  [AR 587:9-22.]  Ms. Rianda earned her bachelors degree and teaching certificate from the University of California, Berkeley.  She earned her Learning Handicap Credential from the University of California, Santa Cruz and has a Resource Specialist Certificate.  [AR 580:12-17.] Ms. Rianda was qualified to, and had experience in, conducting individual diagnostic examinations of students and developing Behavior Support Plans ("BSP") .  [AR 588:20-21; 591:18-19.]

The WRAT measures a student's decoding, spelling, and math skills.  The WRAT provides the assessor with the student's equivalent grade level and percentile.  [AR 588:13-16.] On the WRAT, Eric demonstrated weakness in math and spelling and high level decoding skills. [AR 589:10-13.]  The Bruckner assesses a student's capabilities in addition, subtraction, multiplication, and division.  [AR 590:13-25.]  Eric scored perfectly in addition and close to the target score in subtraction.  However, he was weak in multiplication and division.  [AR 591:2-6.] The PIAT is a silent reading comprehension assessment.   Eric performed above grade level on the PIAT.  [AR 591:8; 591:25.]

_____

[1] All cites to the administrative record are to the sequential bates numbers appearing in the lower right hand corner.  Where lined pleading paper or paragraph numbers appear, this additional information has been added to the cite for the Court's reference.

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

1    In September of 2002, Clements McGuire, an educational assistant, conducted a classroom

2    observation to determine how Eric interacted with others in the classroom environment.  Ms.

3    McGuire reported that Eric attended to the proscribed tasks, did not require assistance, was not

4    easily distracted by others, and did not distract others.  At times Eric appeared lethargic, but was

5    not restless or confused by oral directions.  [AR 594:13-595:3; 1213.]

6    Also as part of his triennial review, Ms. Christy Hadley, a District psychologist, reviewed

7    Eric's student records and spoke with Eric's teachers.  Based on this review, she determined that

8    the District had sufficient information to determine Eric's eligibility and to develop an appropriate

9    placement.  [AR 852:21-25.]  Ms. Hadley spoke with Ms. Rodriguez and sent her a confirming

10   letter, indicating that no further psychological testing of Eric was needed.   [AR 852:25-853:1-6;

11   856:3-8; 1212.]  Ms. Rodriguez did not request further assessments.  [AR 855:21-22.]

12   **October 4, 2002 IEP**

13   Following the completion of the assessment and observation, Eric's individualized

14   education plan ("IEP") team convened on October 4, 2002 for its triennial review.  [AR 01145-

15   01163.]  Among others, Ms. Rodriguez, Eric, Ms. Rianda, and Lisa Fox, a District speech and

16   language therapist, attended the IEP team meeting.  [AR 1148.]  Ms. Hadley did not attend the IEP

17   team meeting because no psychological assessments were reviewed.  [AR 857:13-14; 1212.]

18   At the meeting, the team discussed Eric's present levels of performance and needs,

19   reviewed Eric's file and the assessments conducted by Ms. Rianda.  [AR 1151-1155.]  The team

20   offered placement in the District's Special Day Class ("SDC") program for three to four periods

21   per day.  To address Eric's dysfluency, the team offered direct speech and language therapy three

22   times per month.  The team also suggested that Eric participate in Hillsdale's anger management

23   program.  [AR 1146-1148.]  Ms. Rodriguez  received the Notice of Procedural Safeguards,

24   indicated she understood her rights, and consented to the IEP.  [AR 306:7; 1148.]

25   **November 12, 2002 IEP**

26   On November 12, 2002, Eric's IEP team convened for the purpose of drafting a BSP.  [AR

27   1169.]  In preparation for the November 12, 2002 IEP, the District requested consent to conduct an

28   environmental assessment, which examines a student's academic behavior, discipline and school

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

1    functioning.  [AR 601:17-20; 601:25-602:3 602:9-12; 1242.]  The purpose of an environmental

2    assessment was two-fold: (1) to determine if Eric needed more support or services, and (2) to

3    determine if he needed a BSP.  [AR 602:5-12.]  Based on Eric's general behavior and school

4    performance, the IEP team developed a BSP.  [AR 603:9-17.]

5        The IEP team discussed that Eric's behaviors were caused by anger, frustration, fear of

6    success, and low self-esteem and designed the BSP to target inappropriate classroom behavior.

7    [AR 603:25-604:9.]  The interventions outlined in the BSP consisted of specific teaching

8    strategies, positive reinforcement, one-to-one assistance when necessary, a tutorial study period,

9    anger management counseling, and weekly progress reports.  [AR 604:15-605:3; 01170.]

10        The District implemented the BSP.  [AR 605:11-13.]  Upon implementation, Eric's

11   behavior improved and there was a decrease in negative behaviors.  [606:2-10.]  For example,

12   prior to the implementation of the BSP, Eric received nine disciplinary referrals in September and

13   October.  [AR 652:20-22; 977-978.]  After the creation of the BSP, Eric received a total of eleven

14   referrals in six months, averaging less than two per month.  [AR 978-979.]  Also at the November

15   2002 IEP, the team continued to offer placement in SDC, three to four periods per day and direct

16   speech and language therapy three times per month.  [AR 1165.]  Ms. Rodriguez received the

17   Notice of Procedural Safeguards, indicated she understood her rights, participated in the IEP team

18   meeting, and consented to the IEP.  [AR 308:12, 22; 1246.]

19   **May 15, 2003 Arrest**

20        On May 15, 2003, Eric was arrested for stealing beer from Mollie Stones, a San Mateo

21   supermarket.  [AR 995.]  The District was not notified of Eric's arrest or any of his scheduled

22   juvenile court proceedings.

23   **November 13, 2003 IEP**

24        On November 13, 2003, Eric's IEP team convened for its annual review.  Among others,

25   the IEP team meeting was attended by: general education teacher Ms. Rianda,[2] special education

26   _____

27   [2] Previously his special education teacher, Ms. Rianda was Eric's tenth grade science teacher. [AR 616:22-
     23.]

28

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

1 teacher Jessica Hahn, speech and language pathologist Ms. Fox, Eric, and Ms. Rodriguez. [AR

2 963-975.] At this time, the District was still unaware of Eric's pending juvenile criminal case.

3       In the area of speech and language, Eric's IEP team developed accurate present levels of

4 performance, appropriate goals, and offered consultation speech and language therapy at the

5 November 13, 2003 IEP team meeting. [AR 695:12-21; 968.] So far that year, Eric was truant for

6 all but two speech and language therapy sessions. [AR 974.] These truancies prevented Ms. Fox

7 from formally assessing Eric, however, as his treating therapist, for two years, she was able to

8 review records and reflect on her observations of Eric during his therapy sessions to identify a

9 need in fluency and draft accurate present levels of performance. [AR 695:12-21; 974.]

10       Eric did not present a need in the areas of receptive, pragmatic, or expressive language and

11 his expressive and receptive language skills were in normal range. [AR 696:20-24; 697:1-16;

12 698:11-18.] Eric demonstrated an ability understand what people said to him and respond

13 appropriately, his vocabulary was in the normal limits and he was able to maintain proper eye

14 contact. [AR 697:1-10.] Further, none of Eric's past speech and language therapists suspected an

15 expressive language deficit. 00697:13-16. Additionally, Ms. Fox did not suspect that Eric

16 suffered from social anxiety as Eric had friends and was socially integrated with other students.

17 [AR 699:10-23.] Based on her knowledge of Eric's needs and abilities Ms. Fox created accurate

18 present levels of performance. [AR 974.]

19       At the IEP team meeting, Ms. Fox recommended modifying Eric's speech and language

20 goals and changing to consultation speech services because of his frequent truancy. [AR 690:15-

21 21.] Specifically, Ms. Fox was concerned about the effect of pulling Eric out of his academic

22 classes for speech given his truancy and poor grades. [AR 691:5-11.] By providing speech and

23 language on a consultation basis, the BSP would be given a chance to improve Eric's attendance.

24 [AR 691:12-20.] When Eric was back on track, his direct service would resume. [AR 692:5-

25 693:1.]

26       In the area of academics, Ms. Rianda and Ms. Hahn presented information to allow the

27 team to develop accurate present levels of performance and offer an appropriate placement. [AR

28 616:20-617:5, 619:12-620:3, 620:23-622:3, 969, 971.] Specifically, Ms. Rianda noted no

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

1    concerns regarding receptive, expressive language, or pragmatic language deficits.  [AR 615:1-

2    10.]  Additionally, Eric did not manifest social anxiety in her classroom.  [AR 624:4.]  Ms. Hahn

3    noted Eric's strengths in the areas of reading comprehension, vocabulary, and creative writing and

4    weaknesses in the areas of attendance, expository writing, and mathematics.  [AR 743:11; 744:25-

5    745:4; 745:11-22.]  While aware of Eric's past behavior problems, she did not observe present

6    behavior problems in her class.

7         To address Eric's behavioral needs, the IEP team developed a new BSP.  [AR 975.]  The

8    original BSP, created at the November 12, 2002 IEP to address Eric's inappropriate classroom

9    behavior, was found to be no longer appropriate because the problem had resolved.  [AR 604:3-9;

10   746:12-19; 747:18-23.]  Instead, Eric's primary struggle was with truancy.  Thus, the BSP was

11   revised to provide for daily planner checks, one-on-one assistance during tutorial at least twice a

12   week, weekly progress reports, positive progress reports sent home, and counseling from Glen

13   Bautista, the District probation officer, to discuss the legal ramifications of his truancy.  [AR

14   748:20; 750:12-17; 750:22-24; 975.]  The IEP team also offered Hillsdale's anger management

15   program and smoking cessation classes.  [AR 751:22-752:2.]  Finally, the BSP required Ms. Hahn

16   to personally call Eric on his cell phone when he did not appear in class or to call Ms. Rodriguez.

17   [AR 751:6-10.]  These services were offered to help Eric cope with frustration and fear of success.

18   [AR 748:24-25; 752:6-8.]  Eric's IEP team did not refer him to County Mental Health because his

19   behaviors did not warrant such a referral.  Specifically, Eric was receiving on-site counseling and

20   his behavior was improving.  [AR 616:2-3; 863:24-25.]

21        After discussing Eric's needs and present levels of performance Eric's IEP team offered

22   him a placement in SDC, three periods per day.  [AR 968.]  Ms. Rodriguez received the Notice of

23   Procedural Safeguards, indicated she understood the Notice of Procedural Safeguards, participated

24   in the IEP team meeting, and agreed with all parts of the IEP.  [AR 315:19, 22; 316:2, 10; 1275.]

25   Notably, Ms. Rodriguez did not express any disagreement with the IEP, not request an alternative

26   placement and did not request any additional services or assessments.  [AR 316:14-24.]

27        In the first two months of implementing the BSP, between November 2003 and January

28   2004, Eric's grades improved from all F's to two C's, two D's, a D- and an F.  [AR  752:13-15;

1   989.]  Ms. Hahn testified that it is impossible to have passing grades and turn F's into C's without

2   attending class.  [AR 752:15-17.]

3   **Juvenile Proceedings**

4          Eric's May 15, 2003 arrest was adjudicated by the Alameda Juvenile Court on March 4,

5   2004.  The court adjudged Eric a ward of the court pursuant to California Welfare and Institutions

6   Code section 602 and sustained a charge of violation of California Penal Code section 484,

7   Misdemeanor-Petty Theft.  [AR 996-997.]  The Court ordered Eric to serve sixty days in juvenile

8   hall.  [AR 1000.]  However, as an alternative to this sentence, the Court approved Eric's

9   enrollment in an out-of-state wilderness program, Rocky Mountain Academy, at his parent's

10  expense.  [AR 998-999.]  Ms. Rodriguez accepted this alternative and the juvenile court stayed

11  Eric's detention pending completion of the Rocky Mountain Academy.  [AR 1000.]

12         Court records indicate that Eric ultimately went to Ascent in Idaho, a six-week wilderness

13  intervention program, designed to assist struggling children and run by the CEDU organization.

14  [AR 380:14-22; 281:22998; 1006.]  Ascent is "not a long term education program, so there's not a

15  ton of academic work getting done there."  [AR 396:7-9.]  Students only earn academic credit if

16  they "follow through" and complete the proper paperwork.  [AR 383:20, 25; 384:3-7.]  Eric began

17  the Ascent program at some point between March 18 and March 21, 2004.  [AR 998; 1002.]

18  While there, he received some rudimentary mathematics instruction in the form of "different

19  mathematical problem solving" on an "experiential level."  [AR 400:18-19.]  He did not, however,

20  receive any other formal academics nor did he receive any speech and language therapy.  [AR

21  396:14-16; 400:13.]

22         On March 22, 2004, after Eric had left for Ascent, Ms. Rodriguez informed Ms. Hahn that

23  Eric was attending this program.  [AR 837:3-7.]  Ms. Rodriguez made no request to Ms. Hahn or

24  anyone at the District that the District fund Ascent.  [AR 325:6; 326:6.]  On or about May 4, 2004,

25  Eric completed the Ascent program.  [AR 998.]  Ascent staff then recommended to Ms. Rodriguez

26  that Eric attend CEDU High School in San Bernardino.  [AR 998.]

27         On May 6, 2004, the Juvenile Court accepted Ms. Rodriguez' request that Eric's attendance

28  move to the CEDU High School and Eric remained there until the school closed in March 2005.

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

1  [AR 997; 1006.]  During this time, Ms. Rodriguez did not notify the District of his attendance at

2  CEDU High School nor did she request that the District pay Eric's tuition.  [AR 328:10, 17, 21.]

3      On March 29,2005, Eric returned home to San Mateo and appeared in Juvenile Court.  [AR

4  1014; 1017.]  Court records indicate that Eric and his parents "worked through their considerations

5  and concluded that the Mount Bachelor Academy [in Oregon] is the best placement and source for

6  his academic, emotional and behavioral growth."  [AR 1006.]  Court records further state that "the

7  parents would be allowed to place the Minor at their expense."  [AR 1006.]  Finally, the court

8  permitted Eric to remain at home until his enrollment at Mount Batchelor could take place.  [AR

9  1006.]  Ms. Rodriguez did not notify the District of Eric's enrollment at Mount Bachelor nor did

10  she request that the District pay Eric's tuition.  [AR 330:12, 18; 351:24-352:9.]

11      On May 11, 2005, Eric enrolled at Mount Batchelor.  [AR 1006.]  Eric continued to

12  demonstrate the same behaviors at Mount Batchelor as he displayed at Hillsdale, such as: truancy,

13  low grades, refusal to participate in class, alcohol abuse, and tobacco abuse.  [AR 1110; 1111;

14  1113; 1115.]  During this time, Ms. Rodriguez did not notify the District of Eric's attendance at

15  Mount Batchelor or request that the District pay Eric's tuition.

16      In Eric's final months of high school his behavior and academic achievement improved

17  after an "eye opening phone call with his probation officer on the effect of him getting kicked out

18  of MBA and/or leaving when he was eighteen."  [AR 1113.]  Eric then graduated from Mount

19  Batchelor in June 2006.  [AR 1024.]  Ms. Rodriguez did not notify the District of Eric's

20  graduation.  Ms. Rodriguez did not request reimbursement for this, or any of Eric's private

21  placements, until she filed her request for due process on July 20, 2006.  [AR 1-4; 330:18.]

22  **Due Process Proceedings**

23      The due process hearing occurred on December 18, 19 and 20, 2006.  (AR 228; 2106.)

24  Administrative Law Judge Suzanne Brown ("ALJ") considered the following issues:

25  1.  Did the District deny Student a free appropriate public education ("FAPE") from July 19,
       2003, through the 2005-06 school year by failing to:

26

27      a.  Assess Student's behavioral needs; and

28      b.  Meet Student's unique needs for behavioral and mental health services?

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

2. Did the District deny Student a FAPE from November [13], 2003,[3] through the 2005-06 school year by failing to:

   a.  Have a school psychologist attend the November 13, 2003 IEP team meeting;

   b.  Assess Student in the areas of behavior, speech and language, and academics;

   c.  Provide adequate present levels of performance in the November 13, 2003 IEP in the areas of behavior, speech and language, and academics, which denied Student educational opportunity and his parent an opportunity to participate in the decision-making process;

   d.  Include adequate goals in the November 13, 2003 IEP in the areas of behavior, speech and language, academics, and mental health, which denied Student educational opportunity and his parent an opportunity to participate in the decision-making process; and

   e.  Meet Student's unique speech and language needs in the areas of dysfluency, and expressive receptive and pragmatic language skills?

3. If the District denied Student a FAPE, is the Student's mother entitled to reimbursement for private school placements from March 2004 to June 2006, and related transportation costs?

On February 8, 2007, after receiving testimony and documentary evidence from the parties, ALJ Brown issued a thorough and carefully crafted decision resolving all issues entirely in the District's favor. [AR 144-161.] Plaintiffs thereafter filed the instant action seeking reversal of the ALJ's decision, reimbursement for educational expenses, and attorneys' fees and costs. By this motion for summary judgment, the District respectfully requests that the Court affirm the findings of the ALJ in their entirety and grant summary judgment in favor of the District.

/ / /

/ / /

/ /

---

[3] Eric's 2003 annual IEP team meeting occurred on November 13, 2003. [AR 963.] At times, the ALJ refers to this date as November 12, 2003. Wherever it appears, the District refers to the IEP team meeting by the correct date.

**IV.    SCHOOL DISTRICTS ARE OBLIGATED TO PROVIDE ELIGIBLE STUDENTS WITH A FREE AND APPROPRIATE PUBLIC EDUCATION**

The IDEA guarantees children with disabilities the right to a FAPE. 20 U.S.C. §1400(d). A FAPE consists of special education and related services that meet the state educational standards; include an appropriate preschool, elementary school, or secondary school education; and conform to an individualized education plan ("IEP"), provided at no cost to parents and student. 20 U.S.C. §1401(9). In order to implement the requirements of the IDEA, the United States Department of Education has promulgated regulations found at 34 C.F.R. sections 300.1 *et seq.*

The IDEA does not require school districts to offer the best education available or to provide services and instruction to maximize a student's potential. *Rowley*, 458 U.S. 176, 197 n. 21, 200. Rather, the IDEA requires school districts to provide a "basic floor of opportunity" that includes access to specialized instruction and services that are individually designed for the student and provide "some" educational benefit. *Id.* at 201.

To determine whether a school district has offered a student a FAPE, a court or administrative agency must focus on the adequacy of the school district's program at the time it was offered. *Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999). If the District's program was designed to meet the student's unique needs, provide some educational benefit, comport with the IEP, and offered in the least restrictive environment, the District offered a FAPE, even if the parents' preferred program may have resulted in greater benefit. *Rowley*, 458 U.S. at 207-208; *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1314 (9th Cir. 1987).

A hearing officer may only base his or her decision that a child did not receive a FAPE on substantive grounds. 20 U.S.C. §1415(f)(3)(E); Cal. Educ. Code § 56505(f). A procedural violation amounts to a denial of FAPE only where it impedes the student's right to a FAPE, significantly impedes the parents' ability to participate in the decision-making process regarding the provision of FAPE, or causes a deprivation of educational benefits. *Id.*

/ / /

/ / /

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

1    **V.    THE DISTRICT PROVIDED ERIC WITH A FREE AND APPROPRIATE PUBLIC**

2    **EDUCATION PRIOR TO HIS REMOVAL FROM THE DISTRICT**

3    At the due process hearing, Plaintiffs raised seven examples of actions taken by the District

4    which allegedly resulted in a denial of FAPE.  Specifically, Plaintiffs alleged that the District

5    denied Eric a FAPE between July 19, 2003 through the 2005-2006 school year by (a) failing to

6    assess his behavioral needs and (b) failing to meet his unique needs for behavioral and mental

7    health service.  Additionally, Plaintiffs alleged that the District denied Eric a FAPE between

8    November 13, 2003 through the 2005-2006 school year by (a) failing to have a school

9    psychologist at the November, 13, 2003 IEP, (b) failing to assess Eric in the areas of behavior,

10   speech and language and academics, (c) failing to provide adequate present levels of performance

11   at the November 13, 2003 IEP, (d) failing to include adequate goals in the November 13, 2003 IEP

12   and (e) failing to meet Eric's unique speech and language needs.  In each instance, the ALJ found

13   that Plaintiffs had failed to meet their burden of proof, and found in favor of the District on each

14   issue and sub-issue.  [AR 158-159.]  The District now requests that this Court affirm the ALJ's

15   decision and the District offered Eric a FAPE during the time that he attended the District's

16   school.

17   A.    **The District Did Not Fail to Assess Eric's Behavioral Needs from July 19, 2003**

18   **Though the 2005-2006 School Year.**

19   The IDEA and California Education Code require that school districts perform assessments

20   of all students with a suspected disability in all areas of suspected disability.  20 U.S.C. §

21   1414(a)(2) and (3); Cal.Educ.Code § 56320(e) and (f).  Once an assessment is conducted, a

22   reassessment must occur at least once every three years, unless the parents and school district

23   agree that it is unnecessary.  Cal.Educ.Code § 56381(a).  If an IEP team determines that no

24   additional data is needed to determine a pupil's eligibility or needs, the school district must notify

25   parents, who can forego the reassessment unless requested by parents.  Cal.Educ.Code § 56381(d);

26   34 C.F.R. § 300.533(c) (1999).

27

28

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

1    When a child's behavior impedes his learning, or that of others, the IEP team is required to

2 consider, when appropriate, "strategies, including positive behavioral interventions, strategies, and

3 supports to address that behavior." 20 U.S.C. § 1414(d)(3)(B)(i); 34 C.F.R. § 300.346(a)(2)(i)

4 (1999); Cal.Educ.Code § 56341.1(b)(1). To determine the appropriate strategies and

5 interventions, school districts may conduct a specific assessment known as a Functional

6 Behavioral Assessment ("FBA"). However, if the District can adequately identify appropriate

7 strategies and supports to address behavior that impedes a child's learning, the assessment is not

8 required. Only when maladaptive behavior results in certain disciplinary removals must a school

9 district conduct an FBA. 20 U.S.C. § 1415(k)(1)(D); 34 C.F.R § 300.520(B)(1)(i).

10    In some case, further specialized assessments may be required. Under California law,

11 when a student's behavioral problems become "serious," school districts must conduct an FAA

12 and develop a behavior intervention plan ("BIP"). A "serious behavior problem" is defined as one

13 where the student exhibits behavior that is self-injurious, assaultive, the cause of serious property

14 damage or other severe behavior which is so pervasive and maladaptive that the behavioral

15 approaches found in the IEP are ineffective. Cal.Code.Regs., tit. 5, § 3001(aa) and (f).[4] An FAA

16 only occurs when the IEP team determines that the "instructional/behavioral approaches specified

17 in the student's IEP have been ineffective." Cal.Code.Regs., tit. 5, § 3052(b).

18    At due process, Plaintiffs alleged that the District denied Eric a FAPE by failing to assess

19 his behavioral needs. Specifically, Plaintiff alleged that the District failed to complete an

20 environmental assessment prior to drafting the November 2002 BSP that was in place on July 19,

21 2003. [AR 105:11-17] Additionally, the ALJ considered whether the district should have

22 conducted either an FAA or FBA in Eric's case. On both questions, the ALJ properly determined

23 that the District was not required to perform these assessments. Thus, the District has not denied

24 Eric a FAPE by failing to assess his behavioral needs. [AR 149 (¶¶ 16, 17).]

25 _____

26 [4] The California Department of Education ("CDE") has promulgated state regulations to implement
27 California Education Code requirements, which are found, in relevant part, in Title 5 of the California Code
of Regulations ("C.C.R."), sections 3000 *et seq*.

28

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

1.    ***An Environmental Assessment Was Not Required***

In preparation for Eric's November 12, 2002 IEP, the District requested consent to conduct an environmental assessment.  [AR 601:17-20; 601:25-602:3 602:9-12; 1213; 1242.] However, at hearing, Ms. Rianda testified that she could not recall who completed this assessment. [A.R. 149 (¶16, n. 6); 642:20.]  The ALJ noted that her inability to recall who completed the environmental assessment was not particularly indicative of whether one occurred.  [A.R. 149, ¶16 and n.6.]  Further, Ms. Rianda testified that a classroom observation had occurred on September 20, 2002 to determine how Eric interacted with others in the classroom.  [AR 594:13-16.]  Thus, given that an environmental assessment examines a student's academic, behavior, discipline and school functioning.  Thus, the ALJ's concluded that, when the IEP team met in November 2002, they were able to specifically identify Eric's behavior issues and draft an appropriate BSP to address those behaviors.  [AR 149 (¶16); *see also,* 601:25-602:3.]  Further, because the team properly identified Eric's behaviors and drafted an appropriate BSP in November 2002, any failure to conduct an environmental assessment would not have constituted a denial of FAPE.  [AR 149 (¶16).]; 20 U.S.C. §1415(f)(3)(E); Cal. Educ. Code § 56505(f) [a procedural violation only amounts to a denial of FAPE where it impedes the student's right to a FAPE or causes a deprivation of educational benefits.]

2.    ***An FBA or FAA Was Not Required***

ALJ Brown also properly held that neither an FBA nor an FAA were required to determine appropriate strategies, positive behavioral interventions, and supports to address Eric's truant behavior.  [AR 149 (¶17).]  At Eric's November 2003 IEP team meeting, the team considered his truancy problem and updated his BSP to include "strategies, including positive behavioral interventions, strategies, and supports to address that behavior."  [AR 149 (¶¶9-10).]  Thus, nothing further was required in the form of either an FBA or an FAA.

Importantly, Plaintiffs adduced no evidence at the due process hearing to demonstrate that the District was required to conduct a behavioral assessment.  With respect to an FBA, the ALJ correctly concluded that, because the law requires an IEP team to consider "strategies including

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

1  behavior interventions, strategies, and supports to address behavior," the District was not required

2  to conduct a FBA prior to creating a BSP to address Eric's truancy.  [AR 149 (¶17)]; *see also,* 20

3  U.S.C. § 1414(d)(3)(B)(i).  The IEP team crafted the BSP to address Eric's specific truancy

4  problem by providing daily planner checks, one-on-one assistance during tutorial at least twice a

5  week, weekly progress reports, positive progress reports home, and counseling from Glen

6  Bautista, the District probation officer, to discuss the legal ramifications of his truancy.  [AR

7  748:20; 750:12-17; 750:22-24; 975.]  The ALJ correctly concluded that this was an adequate BSP,

8  designed to meet Eric's unique needs and which that could be implemented by the District without

9  completing an FBA.

10      A similar result was reached in connection with the California Education Code's

11  requirement for an FAA in some cases.  Correctly, the ALJ concluded that Eric's truancy problem

12  did not equate with a "serious behavior problem" as it was not self-injurious, assaultive, the cause

13  of serious property damage or otherwise so severe pervasive and maladaptive that the behavioral

14  approaches found in the IEP were ineffective.  5 C.C.R. § 3001(aa) and (f).  Thus the behavior did

15  not trigger the requirement that the District conduct an FAA.  [AR 149 (¶ 17).]

16      As determined by the ALJ, the District did not deny Eric FAPE by failing to conduct either

17  an FBA or FAA and the District properly and adequately addressed Eric's behavioral needs

18  through the BSP developed by the IEP team.

19      **B.    The District Did Not Fail To Meet Eric's Unique Behavioral and Mental**

20            **Health Needs from July 19, 2003 through the 2005-2006 School Year.**

21      In due process, Plaintiffs asserted that Eric's behavior, grades and attendance record

22  mandated a referral for County Mental Health Services and the District's failure to do so denied

23  him a FAPE.  [AR 106:26-107:2]  However, Plaintiff failed to adduce any evidence to support this

24  claim and ALJ correctly found in favor of the District on the issue.

25      In California, a disabled student may be referred to a community mental health service

26  when the student is suspected of needing mental health services.  Cal.Educ.Code § 56331.  A

27  referral for mental health services may be made when a student's emotional or behavioral

28  characteristics are observed by qualified educational staff, impede the student from benefiting

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

1   from education, are significant by their rate of occurrence and intensity, and are associated with a

2   condition that is not solely a social maladjustment or a temporary adjustment that can be resolved

3   with short-term counseling.  Cal.Gov.Code § 7576(b)(3).  However, before a referral can be made,

4   the referring school district must have (1) assessed the student in all areas of suspected disability,

5   and (2) provided appropriate counseling services and behavioral interventions.  Cal.Educ.Code §

6   56320(f); Cal.Gov.Code § 7576(b)(5).  Only if the school district cannot provide the appropriate

7   mental health services may the school district refer the student to county mental health.

8   Cal.Educ.Code § 56331.

9        Eric's primary behavior problem during the relevant time period was truancy.  "By itself,

10   truancy is not associated with a condition requiring mental health services."[5]  [AR 151 (¶22).]

11   Rather, "a program for a truant special education student generally should include at least one

12   aspect designed to address attendance." [AR 149-150, ¶18, *citing Board of Educ. For Oak Park*

13   *and River Forest High Sch. Dist. v. Illinois State Bd. Of Educ. and Kelly E.,* 21 F.Supp.2d 862,

14   877 (N.D. Ill. 1998)].

15        During the relevant time period, Eric demonstrated a behavioral need in the area of

16   truancy.  [AR 965; 969; 972-973.]  To address the problem, the IEP team developed a BSP.  [AR

17   975.]  Strategies to improve Eric's attendance identified in the November 2003 BSP included

18   organized daily planner checks, one-on-one assistance during tutorial at least twice a week, a

19   weekly progress report, positive progress reports home, and counseling from Glen Bautista, the

20   District probation officer, to discuss the legal ramifications of his truancy.[6]  [AR 750:12-17;

21   750:22-24; 975.]  Further, Ms. Hahn would personally call Eric on his cell phone to advise him to

22   come to class and telephone his mother on occasion.  [AR 150 (¶19); 751:6-10.]  Further, to

23   address the IEP team's perception that frustration, fear of success, and anger may be some of the

24   _____

25   [5] As the ALJ points out, whether or not Eric might have derived some benefit from mental health
     counseling is not a consideration in a FAPE analysis.  Rather, whether or not a student is exhibiting
26   behaviors that require a referral is the sole issue to be considered.  [AR 151 (¶22).]

27   [6] Although Mr. Bautista worked with Eric after his arrest, he was not aware of the arrest and was not
     addressing Eric's criminal proceeding in any manner.  [AR 150 (¶ 19, n.7).]

28

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

1  underlying causes of Eric's truancy, the team provided Eric with counseling, anger management

2  classes, and smoking cessation classes.  [AR 751:23-752:8; 975.]

3     Between November 2003 and January 2004, when these interventions were in place, Eric's

4  grade improved from all F's to two C's, two D's, a D- and an F, improvement that could not have

5  occurred had Eric not attended his classes.  [AR 752:13-17; 989.]

6     At the due process hearing, Plaintiffs did not cite any specific interventions which they

7  contended should have been employed by the District, which were not.  Rather, they simply

8  claimed that Eric should have been referred for mental health counseling.  [AR 150 (¶19).]  Thus,

9  the ALJ correctly concluded that the interventions being implemented by the District were

10 appropriate, especially given that they resulted in Eric's improved attendance.  [AR 151 (¶22).]

11    At the hearing, Plaintiffs introduced testimony from counselors and school personnel with

12 whom Eric worked after his juvenile court placement took effect to establish that Eric required

13 mental health services while a student at Hillsdale.  [AR 375:18-376:11; 530:10-531:4; 760:25-

14 763:2.]  These witnesses generally testified that Eric should have received mental health services

15 from the District.  [AR 107:2-4; 382:9-15; 544:8-12.]  The ALJ appropriately rejected this

16 testimony as speculative and irrelevant, given that the witnesses they had no knowledge of the

17 placement and services provided to Eric through his IEP and given that some of them had not even

18 met Eric until two years after he left Hillsdale. [AR 150-151 (¶22); 378:18-379:4; 394-25-395:12;

19 532:1-11; 553:21-554:14; 789:1-12; 798:1-6

20    Truancy is not a behavior which requires a mental health referral.    Rather, Eric's truancy,

21 and the underlying causes, were appropriately addressed by school district personnel through the

22 implementation of specific direct interventions that, in fact, improved the problem.  [AR 178:8-10;

23 615:25-616:1.]  Thus, based on the evidence presented at hearing, the ALJ correctly concluded

24 that the District appropriately attended to Eric's truancy, was not required to provide a referral to

25 County Mental Health and provided Eric with a FAPE.

26 / / /

27 / / /

28 / / /

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

C.    **The Attendance of a School Psychologist at the November 13, 2003 IEP Was Not Required to Provide a FAPE.**

In due process, Plaintiffs contended that Eric was denied FAPE because a school psychologist, with specific experience and training in behavior modification, did not attend the November 13, 2003 IEP team meeting.  [AR 107:8-22.]  While the ALJ opined that the presence of a school psychologist may have provided some benefit to the IEP team meeting, the failure of one to attend did not deny Eric a FAPE.  [AR 151 (¶23).]

Together, the Code of Federal Regulations and the California Education Code specify the required members of a student's IEP team:

The public agency shall ensure that the IEP team for each child with a disability includes--

(1) The parents of the child;

(2) At least one regular education teacher of the child (if the child is, or may be, participating in the regular education environment);

(3) At least one special education teacher of the child, or if appropriate, at least one special education provider of the child;

(4) A representative of the public agency who--

(i) Is qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities;

(ii) Is knowledgeable about the general curriculum; and

(iii) Is knowledgeable about the availability of resources of the public agency;

(5) An individual who can interpret the instructional implications of evaluation results, who may be a member of the team described herein;

(6) At the discretion of the parent or the agency, other individuals who have knowledge or special expertise regarding the child, including related services personnel as appropriate; and

(7) If appropriate, the child.

34 C.F.R. §300.344(a) (1999); *see also,* Cal.Educ.Code § 56341[containing the same list].  A school psychologist is not required as a matter of course.  Rather, a school psychologist is *only* required when the student is being evaluated to determine if he or she is eligible to receive special education for a specific learning disability ("SLD").  34 C.F.R. §300.540; [AR 151 (¶ 24-25)].

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

1    Eric's November 13, 2003 IEP team consisted of special education teacher Ms. Hahn,

2  general education teacher Ms. Rianda, speech-language pathologist Ms. Fox, a District

3  administrative representative, Eric, and Ms. Rodriguez.  [AR 970.]  At the time of his November

4  2003 annual IEP team meeting, Eric had already qualified under the eligibility category of specific

5  learning disability and speech and language impairment and had a BSP in place.  [AR 151 (¶25);

6  1164; 1170.]  At this time, the main concern was his problem with truancy.  [AR 969; 971.]

7  Because this IEP was not an initial consideration of Eric's eligibility in the SLD category, and

8  because no formal assessments were conducted by a psychologist prior to the meeting, the law did

9  not specifically require the presence of a school psychologist.  [AR 963.]  Rather, the law simply

10  required that the team include all appropriate members who could evaluate and, if necessary,

11  modify the BSP and/or recommend other steps to address Eric's behavior issues.  Both Ms. Hahn

12  and Ms. Rianda are well educated and trained special educators, specifically they both had training

13  in the preparation of BSPs.  [AR 580:12-20; 603:22; 739:6-11, 13-15; 748:3-6.]  Hence, the ALJ

14  properly determined "the absence of any school psychologist at the November 2003 IEP meeting

15  was not a procedural violation" and could not result in a denial of FAPE.  [AR 151 (¶25).]

16    **D.    The District Did Not Deny Eric a FAPE by Failing to Assess in the Areas of**

17    **Behavior, Speech and Language and Academics.**

18    In due process, Plaintiffs alleged that the District failed to assess Eric in the areas of

19  behavior, speech and language, and academics.  As discussed above, the ALJ properly concluded

20  that the District had adequately assessed Eric in the area of behavior.  [AR 149 (¶¶16 and 17).]

21  The District also contends that the ALJ correctly determined that it adequately assessed Eric in the

22  areas of speech and language and academics.

23    For students attending public school, assessments must be conducted if: (1) conditions

24  warrant assessment; (2) a parent or teacher requests an assessment; or (3) every three years unless

25  the parents and school district agree that it is unnecessary.  Cal.Educ.Code § 56381(a).  As

26  previously stated, a school district must assess a student in all areas of suspected disability.  20

27  U.S.C. § 1414(a)(2) and (3); Cal.Educ.Code § 56320(e) and (f).  An assessment may be excused if

28  an IEP team determines that no additional data is needed to determine a pupil's eligibility or

1  needs.  Cal.Educ.Code § 56381(d); 34 C.F.R. § 300.533(c) (1999).  In such a case, the school

2  district must notify parents of the decision to forego assessments and inform the parents of their

3  right to request an assessment.  *Id.*  Assessments are conducted to determine eligibility for special

4  education and related services and to develop present levels of performance and educational needs.

5  Cal.Educ.Code § 56381.  Finally, when a student is privately placed by a parent and when a

6  District is providing a FAPE, the obligation to assess falls on the student's school district of

7  attendance.  20 U.S.C. § 1412(a)(10)(A)(i).

8         **1.**  ***Academics***

9        Eric's triennial IEP team meeting occurred on November 12, 2002.  [AR 1164.]  In

10  preparation for this review the following academic assessments were conducted: WRAT, Bruckner

11  diagnostic math test, and a PIAT.  [AR 152 (¶28); 587:9-22.]  Plaintiffs adduced no evidence at

12  hearing which demonstrated any conditions warranting reassessment in the area of academics as of

13  November 2003.  Further, at no time did Ms. Rodriguez make a request to a reassessment to

14  which the District should have responded. [AR 152 (¶28).]

15        Eric withdrew from the District in March of 2004.  At the time, FAPE was being provided

16  by the District; Eric's mother had consented to the last IEP, the District was in the process of

17  implementing it, and Eric was making progress on his goals.  [AR 752:9-17; 12.]  After his

18  withdrawal Eric attended a wilderness intervention program in Idaho, CEDU High School in

19  Southern California and Mount Bachelor Academy in Oregon.  [AR 380:14-381:22, 997.]

20  According to Eric's juvenile court records, Eric returned to the District briefly, between

21  placements, in March 2005.  [AR 1014; 1017.]  However, Plaintiffs never notified the District of

22  Eric's return.  [AR 352:2-5.]  Thus, from March 2004, until his high school graduation in June

23  2006, Eric was in private placements outside of the jurisdictional boundaries of the District,

24  releasing the District from any obligation to perform academic assessments.  As such, the ALJ

25  properly determined that the District satisfied its obligation to assess Eric in the area of academics.

26  [AR 152 (¶28).]

27  / / /

28  / / /

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main:  323-330-6300  •  Fax: 323-330-6311

**2.**     *Speech and Language*

Eric first received speech and language services in preschool.  [AR 687:18-23.]  He then began receiving speech and language therapy from the public school system in third grade, for the treatment of dysfluency, commonly known as stuttering.  [AR 679:13-680:14; 687:25-688:3; 974.]  Ms. Fox, the treating therapist, recognized this as Eric's area of need and never saw any evidence pointing to any other suspected speech and language disability.  [AR 680:15-681:15; 695:12; 697:13-699:30.]

Plaintiffs presented no evidence presented which would have warranted a reassessment.  Moreover, Ms. Rodriguez did not request that the District conduct further speech and language assessments.  [AR 316:14-24.]  When Eric withdrew from the District in March of 2004, he became a privately placed student with no question by Ms. Rodriguez that the District was providing FAPE.  [AR 998; 1002.]  Thus, the ALJ properly determined that the District conducted proper speech and language assessments during the time during which Eric attended Hillsdale.  [AR 158 (¶18).]

**E.**     **The District Did Not Deny Eric a FAPE by Failing to Provide Adequate Present Levels of Performance in His November 13, 2003 IEP.**

The IDEA requires that each special education student's annual IEP contain a statement of the student's present levels of academic achievement and performance, including the manner in which the student's disability affects his or her involvement and progress in the general education curriculum.  20 U.S.C. §1414(d)(1)(A)(i); 34 C.F.R. § 300.347(a)(1) (1999); Cal.Educ.Code §56345(a)(1)(A).

> Schools are required to develop an individualized education program (IEP) for each child with a disability. An IEP is a program of instruction and related services that has been specially designed to meet the unique needs of the child. The IEP document contains information concerning the child's present levels of performance; a statement of annual goals and short term instructional objectives; a statement of the specific educational services to be provided, and the extent to which this can be done in the regular educational programs; and objective criteria for measuring the student's progress.

*Hampton Sch. Dist. v. Charles Dobrowolski*, 976 F.2d 48, 50 (1st Cir. 1992); see also, *Ojai Unified Sch. Dist. v. Jackson*s, 4 F.3d 1467, 1469 (9th Cir. 1993).

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

1      The IEP should accurately and completely describe the student's performance in all areas

2  of his education that are affected by his disability.  Often this is done through a discussion of

3  "baseline data" which can be provided through a combination of assessment data and

4  observational information regarding the student's performance in the classroom.  *See, e.g. French*

5  *v. Omaha Public Schools,* 766 F.Supp. 765, 794-796 (Neb. 1991); *B.B. v. Hawaii Dept. of Educ.,*

6  483 F.Supp. 1042, 1047 (D. Hawai'i 2006) [noting that a sufficient baseline was established based

7  on prior present levels, classroom observations and student's work product].

8      In *French,* the Court listed numerous examples of statements made in the IEP that

9  described the present performance levels of performance and the manner in which the student's

10  disability affected his progress in the general education curriculum, such as "Testing/instruction

11  requires 2x normal administration time", "Picture matched to word---50% correct" and "Word

12  Reading---1.7 grade equivalent---9% for 2nd grade."[7]  *French,* 766 F.Supp. at 794-796.  With

13  such baseline information, the IEP team can then set measurable goals and objectives for the

14  student moving forward.

15      At the time of the November 13, 2003, IEP meeting, the IEP team explicitly outlined

16  Eric's present levels of performance where they could.  [AR 1271, 1272.]  In math, for example,

17  Eric's present level of performance was an "F in Math Spring '03."  [AR 1272.]  Additionally, the

18  IEP included a page entitled "Assessment Information/Present Levels of Performance.  [AR

19  1274.]  This document demonstrated that Eric's excessive truancy made it difficult to ascertain

20  specific present levels of performance [AR 1274.]  However, the document also indicated that Eric

21  had received 40 credits, had an overall GPA of .923 and continued to fail classes due to excessive

22  absences.  [AR 1274.]

23      While the ALJ noted that the November 13, 2003 IEP had less information regarding

24  present levels of academic achievement and functional performance than what would be ideal, she

25  concluded that the IEP team members were very knowledgeable about Eric and therefore able to

26  _____

27  [7] The student in this case was a 14 year old with physical disabilities and profound deafness.

28

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

1  make "knowledgeable recommendations about his proposed program." [AR 152 (¶27); 616:22;

2  695:12-21; 743:11; 744:25-745:4; 745:11-22; 974.] Thus, the lack of detail in the present levels it

3  did not amount to a loss of educational opportunity to the Eric or otherwise cause a procedural

4  violation to result in a substantive denial of FAPE. 20 U.S.C. §1415(f)(3)(E); Cal. Educ. Code §

5  56505(f).

6      Further, Eric's mother participated in the IEP team meeting and consented to all parts of

7  the IEP. [AR 1275.] In fact, the "Assessment Information/Present Levels of Performance" page

8  of the IEP states that Eric's mother was asked to "help in getting Eric to attend class regularly."

9  [AR 1274.] Thus, under the standards articulated in *Rowley*, the ALJ properly concluded that

10  there was no denial of FAPE created by the failure to completely include all levels of performance

11  in the IEP. *Rowley*, 458 U.S. at 207-208 [a program designed to meet the student's unique needs

12  provide some educational benefit, comport with the IEP, and offer placement in the least

13  restrictive environment is an offer of FAPE].

14      **F.    The District Did Not Deny Eric a FAPE by Failing to Include Adequate Goals**

15          **in the November 13, 2003 IEP.**

16      The IDEA requires that an IEP to include a "statement of measurable annual goals" which

17  allow the "child to be involved in and make progress in the general education curriculum and meet

18  each of the child's other educational needs that result from the child's disability." 20 U.S.C. §

19  1414(d)(1)(A)(i)(II); *see also* Cal.Educ.Code § 56345(a)(2).

20      At the November 13, 2003 IEP meeting, Eric's identified areas of need were academic

21  responsibility, literacy skills, math skills, attendance, and dysfluency. [AR 1268; 1280; 1281.]

22  Based on these areas of need the IEP team developed goals to specifically address each area. [AR

23  1271; 1272; 1281.] The team also developed the BSP to address Eric's truancy. [AR  1280.]

24      To address Eric's need in the area of academic responsibility goal, the IEP identified the

25  goal that "by 11/04 Eric will demonstrate improved responsibility" and outlined specific short-

26  term objectives to reach that goal as follows: (1) "by 1/04, Eric will attend 6 our of 6 classes on 5

27  out of 5 days unless excused by mother" and (2) "by 4/04, Eric will bring home a completed

28

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

1  progress repot on Friday that he will take to each of his teachers to complete." [AR 1271.]  To

2  address Eric's need in the area of literacy skills, the IEP identified the goal that "by 11/04, Eric

3  will demonstrate improved literacy skills as measured by sample, testing &/or teacher report" and

4  outlined specific short-term objectives to reach that goal as follows: (1) "by 2/04, Eric will write

5  an expository 5 ¶ essay w/75% accuracy in spelling, grammar, & punctuation" and (2) "by 6/04,

6  Eric will write an expository 5 ¶ essay w/85% accuracy in spelling, grammar, & punctuation."

7  [AR 1271.]

8       To address Eric's need in the area of math skills, the IEP identified the goal that "by 11/04,

9  Eric will demonstrate an improvement in math skills" and outlined specific short-term objectives

10  to reach that goal as follows: (1) "by 5/04, Eric will attempt, complete, and turn-in 80% of all

11  assigned work in his math class" and (2) "by 11/04, Eric will solve simple algebraic equations

12  with 75% accuracy on teacher-made tests."  [AR 1272.]  Finally, to address Eric's dysfluency, the

13  IEP team developed specific short-term objectives of (1) " by 11/03 Eric will read for 5 min w/no

14  more than 5 dysfluencies and (2) "by 11/04, Eric will be able to describe 3 strategies that increase

15  fluency."  [AR 1281.]  Finally, with respect to whether or not the District had included adequate

16  goals in the area of mental health, the ALJ noted that Eric's BSP contained a goal for "cooperative

17  and positive attendance."  [AR 153 (¶30); 1280.]

18       Despite Plaintiffs' allegation that the District failed to create adequate goals, Plaintiff

19  failed to adduce any evidence at the due process hearing which supported this claim.  [AR 152

20  (¶29).]  By contrast, the District presented evidence and argument that the very specific goals and

21  objectives created at the November 13, 2003 IEP team meeting were sufficiently measurable to

22  meet Eric's needs and enable him to make progress in the general curriculum.  20 U.S.C.

23  §1414(d)(1)(A)(iii); Cal.Educ.Code §56345(a)(2); [AR 152-153 (¶¶29-30); 156 (¶10); 159 (¶20)].

24  Moreover, as noted by the ALJ, even if Plaintiffs had produced evidence demonstrating that the

25  goals were not sufficient, they failed to introduce evidence which would demonstrate how such a

26  procedural violation resulted in a denial of FAPE.  [AR 153 (¶30); 746:20-24; 748:1-6; 822:14-

27  823:20.]  Thus, the ALJ properly found that the Plaintiffs "failed to establish that the goals denied

28  him a FAPE." [AR 153 (¶30).]

1    **G.    The District Did Not Deny Eric a FAPE by Failing to Meet His Speech and**

2    **Language Needs.**

3    At due process, Plaintiffs contended that the District failed to properly meet Eric's speech

4    and language needs in the areas of dysfluency, expressive, receptive, and pragmatic language

5    skills. [AR 3.] Specifically, Plaintiffs contended that the District denied Eric a FAPE when they

6    failed to increase his services and adjusted his direct speech therapy to a consultation based

7    service. [AR 3, 108:18-26.]

8    School districts must provide disabled students with an IEP designed to meet his unique

9    needs and which is reasonably calculated to enable the child to receive benefit from his education.

10   *Rowley,* 458 U.S. at 206-207. In this case, in the area of speech and language, the District

11   identified Eric's needs and designed an appropriate program to address them.

12   By the time of the subject IEP, Eric had been receiving speech and language therapy from

13   the public school system since the third grade. [AR 240:9.] Throughout, his need was always

14   dysfluency and he was provided a number of techniques and strategies to address and cope with

15   his needs. [AR 685:18-19; 686:17-20; 687:6-9.] In high school, Ms. Fox again identified Eric's

16   speech and language needs as being in the area of dysfluency, basing this determination on a

17   review of Eric's records as well as direct clinical interactions and observations. [AR 695:12-21;

18   974.]

19   To address Eric's speech and language needs, in November 2002 his IEP team offered

20   direct speech and language services. [AR 1165.] However, in high school Eric became

21   complacent, failing to utilize the techniques and strategies he had been taught, with truancy

22   increasingly interfering with the District's ability to deliver speech and language therapy to him.

23   [AR 687:6-9; 689:4-14.] In fact, during the first few months of his tenth grade year preceding the

24   IEP team meeting, Eric attended only two speech and language therapy sessions. [AR 689:4-14.]

25   Because of Eric's truancy, the IEP team determined that the best speech and language

26   program would be an offer of consultation services. [AR 690:15-21.] The IEP team believed that

27   until Eric began attending school regularly and brought up his failing grades, pulling him out of

28   class for direct speech and language services would be counterproductive to his overall academic

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

1   success.  [AR 691:5-11.]  As the IEP team discussed, the plan was always to resume direct speech

2   and language services once the BSP began to improve Eric's attendance.  [AR 691:12-20; 692:5-

3   693:1.]  Significantly, Eric's mother was present at the IEP team meeting and consented to this

4   change in services.  [AR 692:2-4; 970.]

5       The ALJ recognized that Eric's truancy problem created a need to maximize Eric's

6   opportunity to participate in class.  [AR 153 (¶32).]  Thus, she properly determined that the

7   District's decision to provide "speech consultation instead of direct therapy did not constitute a

8   denial of FAPE."  [AR 153 (¶32).]

9       Regarding the issue of other potential speech and language problems, Plaintiffs pointed to

10  no evidence at hearing that Eric had a speech and language need other than his dysfluency.  (AR

11  153 (¶31).]  Further, neither Ms. Fox nor any previous speech and language pathologist had

12  identified other needs.  [AR 680:15-681:15; 695:12; 697:13-699:30]  As Ms. Fox testified, Eric's

13  expressive and receptive language skills were in the normal range, as demonstrated by his ability

14  to understand what people said to him and respond appropriately.  [AR 697:1-10.]  She also noted

15  that his vocabulary was in the normal limits and he was able to maintain proper eye contact.  [AR

16  697:5-6; 698:11.]  Thus, the ALJ properly concluded that Plaintiffs failed to show any other

17  speech and language needs which the District had failed to address.

18

19  VI.    **PLAINTIFFS ARE NOT ENTITLED TO REIMBURSEMENT FOR ERIC'S**

20         **PRIVATE SCHOOL PLACEMENT AND RELATED TRANSPORTATION COSTS**

21         **FROM MARCH 2004 TO JUNE 2006**

22      "Parents who unilaterally change their child's placement…without the consent of state or

23  local school officials, do so at their own financial risk."  *Burlington v. Dep't of Educ.*, 471 U.S.

24  359, 373-374, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).  Specifically, in order for the parents of a

25  child with a disability to receive reimbursement for private placement they must establish several

26  important criteria.  First, they must establish that the local education agency failed to provide the

27  student with a FAPE.  Second, they must demonstrate that the private placement itself was

28  appropriate to meet the unique needs of the student.  And third, the parents must establish that they

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

1   provided proper and timely notice to the local education agency of the intent to privately place the

2   student.  20 U.S.C. § 1412(a)(10)(C).

3       The ALJ properly denied Eric's mother's claim for reimbursement because Plaintiffs failed

4   to prove all three of the stated requirements.  Additionally, Ms. Rodriguez represented to the

5   juvenile court that she would fund Eric's private placement as an alternative to juvenile detention.

6   [AR 998-999; 1006.]  Thus, this court should affirm the ALJ's decision and deny Plaintiffs request

7   for reimbursement.

8       **A.     Plaintiffs Failed to Demonstrate that the District Denied Eric a FAPE.**

9       To receive reimbursement for private school placement, Plaintiffs must demonstrate that

10  the District denied Eric a FAPE.  20 U.S.C. § 1412(a)(10)(C).  As described in section V above,

11  Plaintiffs failed to prove that the District denied Eric a FAPE during the time in which he attended

12  the District's school.  Rather, the District developed an educational program that was reasonably

13  calculated to enable Eric to receive educational benefit.  The District conducted appropriate

14  assessments, created an appropriate IEPs, and properly implemented the IEPs to the extent

15  possible with Eric's excessive truancies.  Additionally, the District complied with the procedural

16  requirements of the IDEA.  As a result, Plaintiffs failed to satisfy the first prerequisite to receipt of

17  reimbursement for private school placement.

18      Moreover, it is disingenuous for Plaintiffs to argue that the private placements were

19  somehow necessary because the District had filed to provide Eric with a FAPE.  Rather, the

20  undisputed evidence demonstrated that the placements arose *solely* because of Eric's arrest and

21  adjudication by the juvenile court.  [AR 992-1023.]  More specifically, the initial private

22  placement was a condition of probation to which the Court agreed in lieu of Eric's 60 day

23  detention in Juvenile hall.  [AR 262:24; 263:15-264:17; 990; 999-1000.]  Further, there is no

24  evidence in the record that Ms. Rodriguez communicated any disagreement with the IEP's that

25  were being implemented prior to Eric's placement at the private institutions.

26  / / /

27  / / /

28  / / /

B.     **Plaintiffs Failed to Demonstrate that the Private Placements Were**
**Appropriate.**

In addition to a remedy Plaintiffs must prove that the private school placements were appropriate.  *Burlington v. Dep't of Educ.*, 471 U.S. 359; *Florence County Sch. Dist. v. Carter ("Carter"),* 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993).  While parents are not held to the same standards of appropriateness as school districts, they must demonstrate that "the education provided by the private school is reasonably calculated to enable the child to receive educational benefits."  *Carter*, 510 U.S. at 11.

As the ALJ noted in her decision, when a student's "placement is a response to medical, social or emotional problems that is necessary quite apart from the learning process," school districts are not required to fund the placement.  [AR 157 ¶15.]  *Clovis Unified Sch. Dist. v. Office of Admin. Hearings*, 903 F.2d 635, 643, 646 (9th Cir. 1990). As Eric's placement at Ascent, CEDU and Mt. Bachelor Academy arose solely out of the adjudication of a juvenile criminal matter, *without any consideration for his unique educational needs,* the ALJ properly denied Plaintiffs claim for reimbursement for these inappropriate private placements. [AR 159 ¶22.]

At hearing, Plaintiff adduced no evidence to establish that the private schools were appropriate placements for Eric.  One of Eric's counselors at Ascent's director described Ascent as a base-camp model, assessment program for troubled teens.  [AR 380:15-18.]  He explained that program acted as an intervention, removing students from the problems of life, for the purpose of addressing problematic and destructive behaviors.  [AR 380:15-381:22.]  *The program was not an educational/academic program,* with over 80% of a student's time spent on physical education, counseling, kitchen chores and wilderness training.  [AR 1105.]  Specifically, Mr. Moore admitted that Ascent was "not a long term education program, so there's not a ton of academic work getting done there."  [AR 396:7-9.]  In fact, Students only earned academic credit if they "followed through" and completed the proper paperwork.  [AR 383:20; 384:3-7.]  Further, the only academic credits Eric may have earned while at Ascent were in physical education and writing.  [AR 383:25.]  However, Plaintiffs even failed to provide evidence demonstrating that Eric actually received these academic credits.  In terms of mathematics, the only exposure Eric received was

Defendant San Mateo Union High School District's Motion for Summary Judgment

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main:  323-330-6300  •  Fax: 323-330-6311

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

1  "different mathematical problem solving" on an "experiential level." [AR 400:18-19.] Finally,

2  Eric received no speech and language therapy while attending Ascent as they did not employ a

3  speech and language pathologist. [AR 153-154 (¶33); 396:14-16.] In fact, Ascent does not

4  employ a speech and language pathologist. [AR 396: 14-16.] Thus, Ascent was not a proper

5  educational and academic placement which attempted to meet Eric's unique needs as set forth in

6  his last IEP or otherwise. Therefore, as found by the ALJ, Plaintiffs cannot receive reimbursement

7  for the tuition at Ascent.

8  Similarly, Plaintiffs did not establish at hearing that CEDU was an appropriate placement

9  for Eric. [AR 153 ¶33.] In fact, nobody from CEDU appeared as a witness. Mr. Moore

10  summarily opined that CEDU would have been appropriate but failed to explain the basis for his

11  opinion and testified that he had never been to that facility. [AR 387:21-23; 388:1.] During the

12  time Eric attended the CEDU program in Southern California he again received no speech and

13  language therapy. [AR 153-154 (¶33).] Thus, as with Ascent, Plaintiffs failed to establish that

14  CEDU was a proper educational and academic placement which attempted to meet Eric's unique

15  needs as set forth in his last IEP or otherwise. Thus, the ALJ properly found that Plaintiffs cannot

16  be reimbursed for the CEDU program.

17  Finally, Plaintiffs failed to prove that Mount Batchelor was an appropriate placement.

18  While at Mount Batchelor, Eric's academic, speech, truancy, and behavioral needs were not

19  addressed. During the majority of Eric's tenure at Mount Batchelor, Eric failed to make academic

20  progress. Eric's grades were low and he was placed on "academic warning." [AR 1109-1111.]

21  Plaintiffs admitted no evidence indicating that Eric's failing grades, math skills or literary skills

22  were being addressed. Plaintiff's admitted no evidence indicating that Mount Batchelor was

23  addressing is "attitude to not accomplish anything in his classes and find ways to not go to class. .

24  . ." [AR 1110.] Eric did not receive speech and language therapy while attending Mount

25  Batchelor. [AR 153-154 (¶33).] Finally, Eric continued to have behavioral problems while

26  attending Mount Batchelor. [AR 1110; 1111; 1113; 1115.] Only after an "eye opening phone call

27  with his probation officer on the effect of him getting kicked out of MBA and/or leaving when he

28  was eighteen" did Eric's behavior improve in October, 2005. [AR 1113.]

1    Thus, again, Plaintiffs failed to establish that Mt. Bachelor was a proper educational and

2    academic placement which attempted to meet Eric's unique needs as set forth in his last IEP or

3    otherwise and the ALJ properly found that Plaintiffs were not entitled to reimbursement for this

4    program.

5    **C.    Plaintiffs Failed to Provide the District with Adequate and Required Notice of**

6    **Their Intent to Privately Place.**

7    Reimbursement may be limited or denied entirely if parents fail to provide proper notice of

8    the intent to place their disabled student in a private school.  20 U.S.C. § 1412(a)(10)(C)(iii).

9    Notice may be provided at an IEP team meeting or in writing ten business days *prior to* removal

10    from the public school system.  20 U.S.C. § 1412(a)(10)(C)(iii); *Rebecca B. v. State of Hawaii*,

11    2006 WL 1737908 (D.Hawaii 2006); *Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 524 (6th

12    Cir. 2003).

13    In *Rebecca B.*, the court denied a disabled student's parent request for reimbursement

14    because they failed to provide written notice of their intent to privately place.  2006 WL 1737908.

15    After agreeing with the IEP developed by for the 2003-04 school year, the student's parents

16    enrolled her in a private school.  *Id.*  Following the school district's inquiry regarding placement

17    for the 2004-05 school year, the student's parents left a message informing the school district that

18    the student would not attend public school.  *Id.*  The school district confirmed the parents

19    intentions in a letter, to which the parents failed to respond.  *Id.*

20    Similarly, in *Berger*, the court denied a parent's request for private school reimbursement

21    after the parent consented to the pertinent IEP, enrolled the student in a private placement, and

22    only then notified the school district of the intent to place in a private school.  *Berger,* 348 F.3d at

23    524.  Because the parents enrolled the student in the private school placement before providing

24    notice to the school district, parents failed to give the school district the opportunity to respond to

25    specific objections and the intent to remove their child.  *Id.*  Thus, the request for reimbursement

26    was denied.  *Id.*

27    In Eric's case, his mother failed to provide the District with proper notice of her intent to

28    privately place Eric.  At Eric's IEP's she received a copy of the Notice of Procedural Safeguards

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

1   which notified her of the obligation to inform the District of an intent to privately place.  [AR

2   306:7; 308:12, 22; 315:19, 22; 316:2; 1148; 1246; 1275; 1416; 1417.]  Yet, at Eric's final IEP

3   team meeting, despite having been arrested for stealing and awaiting adjudication by the juvenile

4   court, Ms. Rodriguez did not indicate that she intended to privately place Eric.  [AR 316:14-24.]

5   In fact, she never provided notice prior to placing Eric at any of the programs and failed to request

6   reimbursement for the private placements prior to filing her due process complaint.  Finally, and

7   significantly, Ms. Rodriguez expressed no objection to Eric's November 13, 2003 IEP which was

8   in place at the time of the initial private placement.  [AR 1275.]

9           On March 4, 2004, the juvenile court ordered Eric to enroll in the Rocky Mountain

10  Academy at parent's expense.  [AR 998-999.]  Eric ultimately enrolled in and began the Ascent.

11  [AR 998; 1006.]  Eric began the Ascent program between March 18 and March 21, 2004.  [AR

12  998; 1002.]  Not until March 22, 2004, after Eric began the Ascent program, did Eric's mother

13  notify the District, in a telephone conversation with Eric's special education case manager, that

14  Eric was attending Ascent.  [AR 837:7.]  Moreover, Eric's mother did not request that the District

15  fund Eric's placement at Ascent.  [AR 325:6; 326:6.]  Eric's mother did not provide the District

16  with written notice, within 10 days of removal (or ever), of her intent to privately place Eric.  [AR

17  837:3-7.]  Therefore, the ALJ properly found that Plaintiffs failed to comply with the statutory

18  requirement to notify the District of the intent to privately place.  [AR 154 ¶¶33, 34.]  As a result,

19  the denial of the request for reimbursement was proper.  [AR 154 ¶35; 159 ¶22.]

20          On May 6, 2004, the juvenile court ordered Eric to attend the CEDU program in Southern

21  California, Eric's mother's request.  [AR 997.]  Eric's mother did not notify the District of this

22  transfer, verbally or in writing.  [AR 328:17.]Until she filed the underlying due process complaint,

23  Eric's mother never requested reimbursement for this placement.  [AR 328:10, 21.]

24          On or about May 11, 2005, Eric enrolled at Mount Batchelor Academy in Oregon,

25  pursuant to a juvenile court order.  [AR 1006.]  Court records indicate that Eric and his parents

26  "worked through their considerations and concluded that the Mount Bachelor Academy is the best

27  placement and source for his academic, emotional and behavioral growth."  [AR 1006.]  Eric's

28  mother never notified the District of Eric's enrollment or attendance at Mount Batchelor

Fagen Friedman & Fulfrost, LLP
6300 Wilshire Boulevard, Suite 1700
Los Angeles, California 90048
Main: 323-330-6300 • Fax: 323-330-6311

1 Academy. [AR 330:10-18.] The first time that Eric's mother sought reimbursement for *any*

2 private placement was when she filed the due process complaint in the underlying administrative

3 proceeding. Plaintiffs did not notify the District of Eric's private placement or seek

4 reimbursement for the private placement prior to the filing of the due process complaint because

5 as the juvenile court records demonstrate, Eric's mother agreed to fund the private placement.

6 [AR 997-999; 1006.]

7        Plaintiffs completely failed to establish a right to reimbursement for the Ascent, CEDU

8 and Mt. Bachelor programs. They failed to show that the District had denied FAPE; they never

9 protested the District's provision of FAPE before the placements; they failed to establish that

10 Eric's unique educational needs were being met at the programs; Ms. Rodriguez failed to give

11 notice *prior to* placement; and Ms. Rodriguez did not seek reimbursement until due process.

12 Thus, this Court should affirm the ALJ's determination that Plaintiffs are not entitled to

13 reimbursement for these private programs.

14

15 **VII.    CONCLUSION**

16        ALJ Brown issued a well reasoned decision that cites to findings of fact and conclusions of

17 law on each issue. This thorough and careful analysis of the issues, based on her first hand receipt

18 of the testimony, should be given due deference by this Court. Plaintiffs failed to adduce

19 sufficient evidence to prove any of the issues claimed in the underlying due process proceeding.

20 Thus, the District respectfully requests that this Court affirm ALJ Brown as to all issues and sub-

21 issues in this case.

22

23 DATED: January 30, 2008                    FAGEN FRIEDMAN & FULFROST, LLP

24

25                                            By:  /s/ Kimberly A. Smith
                                                  Kimberly A. Smith
26                                                Attorneys for San Mateo Union High School
                                                  District
27

28