Susan Foley SB 234319
LAW OFFICES OF SUSAN FOLEY
3242 Countryside Drive
San Mateo, CA 94403
Tel: (650) 345.2300
Fax: (650) 345.2302

Attorney for Plaintiffs,
ERIC RODRIGUEZ and
KIMBERLIN RODRIGUEZ

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

ERIC RODRIGUEZ and
KIMBERLIN RODRIGUEZ

Plaintiffs,

vs.

SAN MATEO UNION HIGH SCHOOL DISTRICT,

Defendant.

CASE NO. C 0702360 PJH

PLAINTIFF'S POINTS & AUTHORITIES IN SUPPORT OF OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

DATE: April 9, 2008
TIME: 9:00 A.M.
COURTROOM: 3, 17th Floor

## TABLE OF CONTENTS


I The District Is Collaterally Estopped From Challenging The Appropriateness of the Juvenile-Court-Ordered Schools……………………………4

II Defendant's Contention That Eric Receive A Free, Appropriate Public Education (FAPE) Is Not Supported By the Record of the Administrative Hearing……………………………………………………………6

A. The District Did Not Assess Eric's Behavioral Needs Despite His Behavior Being The Impediment to His Learning…………………………...6

1) The Updated November, 2003, BSP Draft By District Personnel To Address Eric's Truancy Was Also Defective Because It Was Not Pursuant to an Assessment and the BSP Was Contingent Upon Eric Attending School……………………..7

B. Eric Required Mental-Health Services In Order To Benefit From His Education……………………………………………………………8

C. The District's Omission of Not Including A School Psychologist At Any Of Eric's IEP-Team Meetings Was A Denial of a FAPE……………………10

D. The District Was Required To Perform Updated Assessments And Ascertain Eric's Present Levels of Performance Pursuant to California Education Code § 56345(1) and 20 USC § 1414 (d).)………..……11

E. The District Was Required To Provide Adequate Goals By Obtaining Eric's Present Levels of Performance In Order to Address his Educational Needs……………………………………………………………………..12

F. The District Offer of Consultation Speech-Language Therapy To Address Eric's Severe Stuttering Instead of Direct Therapy Was A Denial of FAPE………………………………………………………………..12

III Reimbursement of Costs For the Court-Ordered Schools is Mandated by The Individuals with Disabilities Education Act and The California Education Code Since Eric, At All Relevant Times at Issue, Was Entitled To a Free Appropriate Public Education………………………………………………14

# TABLE OF AUTHORITIES

*Ash v. Oswego School District*
766 F. Supp. 852
(1991)…………………………………………………………………………………15, 16

*Cleveland Heights-University Heights City Sch. Dist. V. Boss, et al.*
144 F.3d 391 (1998)……………………………………………………………………………12

*Clovis Unified School District v. California Office of Administration*
903 F. 2d 635…………………………………………………………………………………..14

*County of San Diego v. California Special Education Hearing Office*
93 F. 3d 1458…………………………………………………………………………………..14

*Greenland School District v. Amy N.*
358 F.3d 150………………………………………………………………………….…..18

*Independent School District v. A.C.*
258 F.3d 769 (2001)……………………………………………………………………………17

*Mrs. B. v. Milford Board of Education, et al.*
103 F. 3d 1114 (1996)……………………………………………………………………....13

*Stephen L. and Laverne L., et al. v. William C. Rhyne, et al.*
2000 U.S. Dist. LEXIS 22305…………………………………………………………………11

*Union School District v. Smith*
15 F. 3d 1519 (1994)…………………………………………………………………….....11

20 USC § 1414 (d)……………………………………………………………………………..11

California Education Code § 56345 (1)……………………………………………..……11

Plaintiffs, Eric Rodriguez and Kimberlin Rodriguez, hereby submit their points and authorities in support of their opposition to San Mateo Union High School District's Motion for Summary Judgment.

The District asserts that Eric could not benefit from his education because he was a truant during the time he attended District schools until the time he was court-ordered to residential schools and that was Eric's own fault. The District also asserts that since Eric was on probation, (despite the fact that he was residing in his mother's home within the district) the district was relieved of its duty to provide an appropriate education. The District further contends that it does not owe reimbursement for the court-ordered residential schools because Eric's mother did not provide the district with written notice of her dissatisfaction with Eric's placement prior to his court-ordered attendance at residential schools.

Plaintiffs have shown that:

1. The IEPs for the years prior to Eric's placement at the court-ordered residential schools did not provide him with an appropriate education;
2. The District was responsible for Eric's education at all relevant times at issue; and,
3. The appropriateness of the court-ordered residential schools has already been adjudicated by the juvenile court therefore, the Administrative Law Judge (ALJ) should have deferred to the juvenile court's prior decision on that issue under the doctrine of collateral estoppels and res judicata.

## I The District Is Collaterally Estopped From Challenging the Appropriateness of the Juvenile-Court-Ordered Schools

> **Collateral estoppel bars relitigation on an issue if: (1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated; (2) the previous proceeding resulted in a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party <u>or in privity with a party</u> at the prior proceeding. *Eilrich v. Remas*, 839 F.2d 630,**

> **633 (9th Cir. 1988) (citing *People v. Sims*, 32 Cal.3d 468, 484, 186 Cal. Rptr. 77, 651 P.2d 321 (1982), superseded by statute on other grounds as stated in *People v. Preston*, 43 Cal. App. 4th 450, 458, 50 Cal. Rptr. 2d 778 (1996))**. (*Stephen L. and Laverne L., et al. v. William C. Rhyne, et al.,* 2000 U.S. Dist. LEXIS 22305.) (emphasis added.)

The three Court Orders issued by the San Mateo County Juvenile Court requiring that Eric's mother place Eric in Court-specified residential schools from March, 2004 through June, 2006, involved thorough investigation by Eric's probation officer. The Administrative Record at 01287 through 01302 sets forth the Probation Officer's opinions and the Court's Orders regarding the appropriateness of the residential schools that the judge ordered and the fact that there were no public or private schools within the area appropriate for Eric (AR 01296, paragraph 5, last line.) The issue of the appropriateness of the three schools was considered by the juvenile court and the juvenile court determined that the placements were appropriate and that the minor's educational placement within the District was not appropriate. The issue of the appropriateness of the placements and the inappropriateness of the prior placements cannot now be relitigated in this case. Further, California Health & Welfare Code § 705.5 (c) (5) required that the Juvenile Court take into consideration Eric's special-needs at the time it ordered placement, and it did.

The juvenile-court orders are now final, and should be considered as judgments on the merits which are no longer appealable. Any statutory time to appeal those decisions has expired.

The District was in privity with the probation department of the County of San Mateo. Eric's San Mateo County Probation Officer, Glen Bautista's office was located on Hillsdale High School's campus (Test. Of K. Rodriguez, AR 00251-00252.) Mr. Bautista was part of Eric's Behavior Support Plan as someone to counsel Eric regarding his truancy. This demonstrated sufficient privity, between San Mateo County Juvenile Probation and Defendant to justify

application of the doctrine of collateral estoppel.

Notwithstanding Defendant's being estopped from challenging the appropriateness of the three schools, Plaintiff did prove, during the administrative hearing on this matter, that the residential schools that Eric attended were appropriate.

## II DEFENDANT'S CONTENTION THAT ERIC RECEIVED A FREE, APPROPRIATE PUBLIC EDUCATION (FAPE) IS NOT SUPPORTED BY THE RECORD OF THE ADMINISTRATIVE HEARING

### A. The District Did Not Assess Eric's Behavioral Needs Despite His Behavior Being The Impediment to His Learning

At the IEP meeting held on November 12, 2002, district personnel obtained Eric's mother's signed consent on an Assessment Plan for the District to conduct an Environmental Assessment (AR 01242.) At the same time, the District obtained Ms. Rodriguez' signature on the IEP that included a Behavior Support Plan (BSP.) The BSP was to be drafted to address Eric's needs as identified from the Environmental Assessment. However, the District never performed the Environmental Assessment required to draft an appropriate and adequate BSP.

An "Environmental Assessment" evaluates a student's behavior in a variety of settings, i.e., within the classroom, during unstructured school time, at home and within the community. The evaluation includes observations by qualified personnel, data collection and standardized instrument tools. The purpose of assessing a student's maladaptive behavior is to observe what the function that the target behavior serves the student, i.e., what the student accomplishes by exhibiting the undesirable behavior. For example, students that want to avoid a specific task within the classroom may act out as soon as a demand is put upon them in order to be sent out of the class. The student has then accomplished his goal by acting out because he is then sent out of the class and therefore is not required to engage in the task he was attempting to avoid.

An IEP team is to then draft a BSP with the goal of extinguishing and replacing the maladaptive behavior. Testimony at the Administrative Hearing revealed that the Environmental Assessment was most likely not done (there is no documentary evidence that the Environmental Assessment was done and there were no witnesses that testified that the assessment was performed.) Further, Ms. Rodriguez' signatures on both the Assessment Plan and the IEP that contained the BSP proves that the Assessment was never done. The district now contends that the "Environmental Assessment" was not necessary.

In this case, the district did not perform the assessment, and simply wrote a Behavior Support Plan that proved to be ineffective. In fact, Eric's behavior deteriorated further after the November 12, 2002, IEP was implemented and Eric's truancy increased and, in fact, became the target behavior one year later on the November 13, 2003, BSP that was prepared again, without an assessment.

The facts in the record contradict the District's contention that there was no harm to Eric's educational progress caused by the District's failure to base its BSP on a proper assessment of Eric's needs. The facts in the records show that between September 2002 and February 2004, Eric received 29 referrals for discipline and was suspended for a total of 12 days and became a habitual truant. (AR 01394-01397.) The disciplinary record demonstrates that the defective BSP dated November 12, 2002, denied Eric a FAPE because it failed to diminish the maladaptive behaviors that continued to interfere with Eric's ability to benefit from his education.

**1) The Updated November, 2003, BSP Drafted By District Personnel To Address Eric's Truancy Was Also Defective Because It Was Also Not Pursuant to An Assessment and the BSP Was Contingent Upon Eric Attending School**

Title 5, California Code of Regulations § 3001(f) states that a Behavior Intervention Plan (BIP) is:

> **A written document which is developed when the individual exhibits a serious behavior problem that significantly interferes with the implementation of the goals and objectives of the individual's IEP.**

A BIP flows from an assessment, either a Functional Behavioral Assessment or a Functional Analysis Assessment. In this case, the district did not perform any assessment of Eric's behavioral needs before preparing his "Behavior Support Plan."

The strategies listed on the November, 13, 2003, BSP could only potentially be effective if Eric attended school. The target behavior for Eric's November 2003 BSP was truancy, yet the District's IEP Team members drafted and implemented a BSP that did not address how to actually get Eric to school. The techniques listed on the BSP were:

Utilizing a daily planner with checks;

One-on-one assistance during tutorial at least two times per week;

Weekly progress reports;

Positive progress report home;

Counseling from the County probation officer at the high school;

It would be impossible to implement the above-listed strategies if the student if he is not present at school. The district's refusal to actually perform an assessment of Eric's behaviors and draft a plan to address his truancy was a denial of FAPE.

**B. Eric Required Mental-Health Services In Order To Benefit From His Education**

The ALJ ignored the testimony of Steven Moore, a licensed clinical professional counselor, Steven Moffitt, Certified Counselor and Patrick Conway, Ed.D. All three of these

professionals testified that Eric required mental-health (MH) services in order to benefit from his education. The reasoning of the ALJ that these professionals did not know Eric during the 2002-2003 school year is not valid since all three were aware of Eric's history and the presenting issues when they did in fact have him as their student and patient following his court-ordered placements.

In fact, the district's obligation was to referrer the student for a County Mental Health assessment for a determination as to whether he required mental-health services in order to benefit from his education. The IEP team's responsibility was to make the referral based on Eric's behavior and the District's own failed BSPs of November, 2002 and November, 2003. A mental-health school based professional would then make a recommendation as to whether or not the student required mental-health services in order for him to benefit from his education and a recommendation of what the services should be. The IEP team then considers the recommendations and the district is to make an offer that would meet the student's needs. In this case, the district refused to make the referral. The district cannot now claim Eric did not require mental-health services since they did not have a mental-health professional evaluate him. There is evidence that Eric required mental-health services from the 2002-2003 school year through his graduation in June, 2006. Eric did not receive MH services while with the district. Eric failed his classes, became a habitual truant and had numerous referrals for discipline. Eric then attended court-ordered schools that provided MH services and succeeded, attended classes, earned good grades, improved his behavior and graduated. At the time of the hearing, Eric was attending San Francisco State University and working in a grocery store. Based upon the events, Eric required MH services to get through his high school years and to help him address his disabilities.

/

All of the above listed witnesses testified that Eric required mental-health services in order to benefit from his education. The witnesses were credible and had worked with Eric directly for months, and sometimes years. The district IEP-Team members documented Eric's need for a referral to County Mental Health on the two Behavior Support Plans that they drafted (AR 01249 and AR 01280.) The district's failure to follow its own recommendations constitutes a denial of FAPE to Eric.

### C. The District's Omission of Not Including A School Psychologist At Any Of Eric's IEP-Team Meetings Was A Denial of A FAPE

Throughout Eric's time at Hillsdale High School, three (3) IEP meetings were held: November 12, 2002 (Eric's Annual IEP meeting,) May 1, 2003 (at the request of his mother) and November 13, 2003 (Annual IEP meeting.)

A school psychologist did not attend any of the meetings, despite the fact that Eric's behavior was a major concern to all of the team members.

The IEP team, on November 13, 2003, consisted of two Special Education teachers, Ms. Rianda and Ms Hahn, a general education teacher, a Speech Language Pathologist and a school administrator along with Eric and his mother.

The "team" then proceeded to modify Eric's BSP from November, 2002, by replacing the target behavior to truancy (the November, 2002, BSP was prepared without an assessment and the modified BSP was also crafted without assessing Eric.) The team did not include any individuals with experience and training in behavior modification.

The district denied Plaintiff a FAPE when it failed to constitute an adequate and complete IEP team that included a professional with behavioral modification training resulting in an axiomatic denial of a FAPE for Plaintiff.

/
/

**D. The District Was Required To Perform Updated Assessments and Ascertain Eric's Present Levels of Performance Pursuant to California Education Code § 56345 (1) And 20 USC § 1414 (d).**

California Education Code § 56345 (1) and 20 USC § 1414 (d) require that an IEP contain a statement of the individual's present levels of academic achievement and functional performance.

> **The individualized education program is a written statement for each individual with exceptional needs that is developed, reviewed, and revised in accordance with this section, as required by subsection (d) of Section 1414 of Title20 of the United States Coe, and that includes the following:**
>
> **A statement of measureable annual goals, including academic and functional goals, designed to do the following:**
>
> **Meet the individual's needs that result from the individual's disability to enable the pupil to be involved in and make progress in the general curriculum.** (California Education Code § 56345 (1).)

The IEP of November 13, 2003, contains an Assessment Information/Present Level of Performance Report by Resource Specialist Teacher, Jessica Hahn wherein she states that since **Eric does not attend school on a regular basis**, **she was not able to ascertain his present levels of performance:**

> **Current testing has not been performed due to excessive absences. Please see academic assessment from Eric's last annual IEP.** (Vol. VI, AR 01274)

The failure of district personnel to assess Eric's academic levels was a denial of FAPE in that:

1) It is impossible to determine if the goals proposed adequately address a student's academic needs; and,

2) It is impossible for a parent to determine if the program offered will meet the

student's needs, thereby denying parent participation in the IEP process.

**E. The District Was Required To Provide Adequate Goals Ascertained By Obtaining Eric's Present-Levels of Performance In Order To Address Eric's Educational Needs**

> **Lack of appropriate objective criteria for measuring student's progress in an IEP was not minor technical violation, but rather statutory violation which made IEP inadequate.** *Cleveland Heights-University Heights City Sch. Dist. v Boss by & Through Boss (1998, CA6 Ohio) 144 F3d 391, 1998 FED App 135P.*

The district's failure to ascertain Eric's present levels of performance in academics, communication and behavior prior to drafting goals was a denial of a FAPE. Without first obtaining a Student's present-levels of performance, it is impossible to determine the student's needs and draft adequate and appropriate goals. The requirements in the IDEA and California Education Code to hold an Annual IEP Meeting is to determine a learning-disabled students current needs and develop an Individualized Education Plan to address the needs and ensure the student can benefit from his/her education. The District's failure to assess Eric's levels was a denial of FAPE. In this case, hindsight exists, in that Eric did, in fact, fail in the District's program and there is no question that the District's "procedural" violations resulted in a substantive denial of FAPE to Eric.

**F. The District Offered Consultation Speech-Language Therapy To Address Eric's Severe Stuttering Instead Of Direct Speech-Language Therapy In Order To Accommodate Eric's Maladaptive Behavior of Truancy**

The District's argument that it only offered Consultative services for Eric's speech-

language needs because Eric was truant too often to benefit from direct therapy is essentially formulating an IEP for a student to accommodate the student's maladaptive behaviors. It is also indicative of the District "giving up" on its student, specifically, what Congress sought to prevent when it enacted the Education for Handicapped Act and the IDEA.

A school district cannot escape its obligation to offer what a learning-disabled student needs simply because it believes the offer will not be accepted.

In *Union School District v. Smith,* 15 F.3d 1519 (1994), the 9th Circuit Court of Appeals found a school district's excuse of not making an offer that it believed appropriate because District IEP-Team members did not think it would be accepted:

> **The District argues that it did not offer McKinnon because the Smiths expressed their unwillingness to consider it as a placement….**
>
> **We find that a school district cannot escape its obligation under the IDEA to offer formally an appropriate educational placement by arguing that a disabled child's parents expressed unwillingness to accept that placement.** *Id.* at 1525.

On November 13, 2003, Eric's speech-language deficits required direct therapy. The district's obligation was to offer services to meet Eric's needs. The District failed Eric in this regard. Eric's truancy was, in part, a result of his low self-esteem and fear of failure that manifested from his severe stuttering. To not provide services to address his stuttering as needed because he was not attending school regularly due to his stuttering, is a vicious circle. The district's speech-pathologist, Lisa Fox's, testimony that she considered the offer of consultation services only as a "therapeutic pause" is creative, but not logical with a student that is truant, in part, due to the anxiety created as a result of his severe stutter. Further explanation by the therapist that she did not want Eric to miss class time because he was truant so often would

necessitate an offer of direct speech therapy to be delivered before or after school hours or during the lunch break. The district did not make any such offer and denied Eric an offer of a FAPE.

A district is required to offer placement and services that it believes is appropriate, regardless of whether or not the district thinks that it will be rejected or accepted, or whether or not the student will avail himself of the services. The district's obligation is to make an offer of related services that the student requires in order to benefit from his education.

Here, the district did not offer services that it very well knew the child needed.

**III Reimbursement of Costs For The Court-Ordered Schools Is Mandated By The Individuals with Disabilities Education Act and the California Education Code Since Eric, At All Relevant Times At Issue, Was Entitled To A Free, Appropriate Public Education**

In *County of San Diego v. California Special Education Hearing Office*, et al. 93 F.3d 1458**,** the Court reiterated its test developed in Clovis Unified School District v. California Office of Administration, 903 F. 2d 635:

> **In *Clovis Unified School District v. California Office of Administration*, 903 F. 2d 635, the Court identified three separate tests to determine when to impose responsibility for residential placements on the special education system: (1) where the placement is "supportive of the pupil's education; (2) where medical, social or emotional problems that require residential placement are intertwined with educational problems; and (3) when the placement is primarily to aid the student to benefit from special education.** *Id.* at 643.

**1) <u>Supportive of the Pupil's Education</u>**

All three of the court-ordered residential schools provided educational services to Eric. All three of the placements provided Eric with the needed mental-health services. Since the impediment to Eric benefiting while he attended Defendant's school was his truancy, and since that was not a problem in the residential placements and Eric did benefit from those placements, earned credits and graduated, the placements were supportive of Eric's education.

**2) Medical, Social and Emotional Problems Are Interwined**

Eric's behavior and his emotional issues as documented within the three IEP documents, his disciplinary record, the reports by the Special-Day class teacher and the speech therapist make it clear that Eric's emotional deficits, and his trouble interacting with peers and teachers impacted his education. His issues were so interwined that he did require mental-health services in his educational placement. The fact that he was truant makes it clear that he would not benefit from his education or related services, including counseling, unless he was present in the educational setting. This element was met regarding Eric's needs being interwined into his educational needs.

**3) To Aid The Student To Benefit From Special Education**

Eric needed to be at school and attend class to benefit from his education. The District's placements failed in achieving the goal of getting Eric to school and class. The residential placements did ensure Eric's attendance in classes and allowed him not only to benefit from his education, but to earn a high-school diploma, go on to college and become a productive member of society.

In a case decided by the United States District Court for the District of Oregon, *Stanley E. Ash, et al. v. Oswego School District*, 766 F. Supp. 852 (1991), surrounding the issue of whether

or not a student required residential placement in order to benefit from his education, the court concluded that:

> **…the Ashes' right to reimbursement for the costs incurred by them in providing Christopher with a residential placement arose in September, 1989, when the school district had been asked to provide educational services to Christopher and had been given a reasonable opportunity to complete the process of evaluating Christopher and making a placement recommendation for him.** (*Id.* at 864-865.)

In the instant case, the District had ample opportunity to assess Eric (beginning in September 2002, through March, 2004) in all areas of need: academics, speech-language, behavior and mental-health, but chose not to. As a result, ineffective IEPs were developed in November, 2002, May 2003 and November, 2003.

In April, 2003, Eric's mother requested a change in Eric's program due to his deteriorating behavior. The district's decision at the May, 2003 IEP meeting, to continue an IEP that was allowing Eric to fail, is a denial of a FAPE. Within 7 school months, Eric's mother was ordered to provide a residential school by the Juvenile court. At the time Ms. Rodriguez contacted the Director of Special Education, Marvin Meyers, via letter, the District knew that the court and Ms. Rodriguez were dissatisfied with Eric's program and his lack of progress. The District had ample opportunities to evaluate Eric and formulate an IEP based on required assessments, but it simply chose not to do so.

> **Despite the statutory preference for mainstream placements, the IDEA recognizes that some disabled students need full-time care in order to receive educational benefit. It defines "special education" to include "instruction conducted . . . in hospitals and institutions," 20 U.S.C. § 1401(25); cf. 34 C.F.R. 300.26 (2000). Regulations promulgated under the statute by the United States Department of Education require that, "if placement in a public or private residential program is necessary to provide special education and related services to a child with a disability, the program, including**

> **non-medical care and room and board, must be at no cost to the parents of the child." 34 C.F.R. § 300.302 (2000). The reason for this rule is straightforward: if a residential placement is educationally necessary because of a student's disability, and the state does not provide it, then the state's IEP is not "reasonably calculated to enable the child to receive educational benefits" as required by *Rowley*. Thus, the IDEA requires that a state pay for a disabled student's residential placement if the student, because of his or her disability, cannot reasonably be anticipated to benefit from instruction without such a placement. See *Mrs. B. v. Milford Board of Ed.,* 103 F.3d 1114, 1122 (2d Cir. 1997) (asking "whether the child requires the residential program to receive educational benefit"); *McKenzie v. Smith,* 248 U.S. App. D.C. 387, 771 F.2d 1527, 1534 (D.C. Cir. 1985) (asking "'whether full-time placement may be considered necessary for educational purposes, or whether the residential placement is a response to medical, social or emotional problems that are segregable from the learning process.'") (quoting *Kruelle v. New Castle County School Dist.,* 642 F.2d 687, 693 (3d Cir. 1981)).** *Independent School District v. A.C.* 258 F.3d 769 (2001). *Id*. at 774.

Eric's behavioral issues, especially his truancy, interfered with his ability to benefit from his education and impeded his learning. His residential placements were not a result of a medical, social or emotional problem that was segreable from the learning process. In fact, the majority of his behaviors were directly related to school. His pattern of truancy was directly related to his schooling. At the time he was arrested for stealing alcohol at the local grocery store, he was supposed to be at school, in class. His behavior was never addressed by his IEP team in any effective manner. Listing things to do for Eric if he comes to school is not a "plan" to correct a pattern of truancy. Discontinuing much-needed speech therapy because the disabled student is truant is also not a strategy intended by Congress when it enacted the IDEA.

> **The fact that a residential placement may be required to alter a child's regressive behavior at home as well as within the classroom, or is required due primarily to emotional problems, does not relieve the state of its obligation to pay for the program under federal law so long as it is necessary to insure that the child can be properly educated.** (citations omitted.) *Mrs. B. v. Milford Board of Education*, *et al.* 103 F.3d 1114 (1996). *Id*. at 1122.

In this case, Eric's behavior rendered his IEP ineffective at allowing him to benefit from his education. The district did nothing to address his truancy. Techniques written into a Behavior Support Plan that is dependent on the habitually-truant student to attend school in order to implement the BSP is not logical. The BSP required a plan within it to actually get the child to school. Further, the district members of the IEP team wrote, as part of its plan on both BSPs (Nov. 02 and Nov. 03) that a County Mental Health (CMH) referral would be made if the strategies set forth on the BSP were ineffective. The district never followed its own written protocol when Eric continued to be truant and never made the CMH referral.

The Lack Of Formal Written Notice of The Private Placement To The School District Does Not Preclude An Order for Reimbursement

The ALJ cited *Greenland School District v. Amy N.* (1st Cir. 2004) 358 F. 3d 150, 160 for the proposition that Plaintiffs would not be entitled to reimbursement even if the district denied Eric a FAPE since his mother did not provide notice to the district. However, the ALJ cited the very end of a passage of the court's decision in *Greenland* and omitted the following:

> **The purpose of the notice requirement is to give public school districts the opportunity to provide FAPE before a child leaves public school and enrolls in private school. *See Patricia P., 203 F.3d at 468* (emphasizing the importance of cooperation between parents and the school district before the child is removed from public school); *Schoenfeld, 138 F.3d at 381-82* (same); *Burlington v. Department of Educ., 736 F.2d 773, 799* [*162] *(1st Cir. 1984)* (noting the distinction "between a unilateral parental transfer made after consultation with the school system . . . and transfers made truly unilaterally, bereft of any attempt to achieve negotiated compromise and agreement"), *aff'd, 471 U.S. 359, 85 L. Ed. 2d 385, 105 S. Ct. 1996 (1985)*.**

In this case, District personnel were well aware that Eric was truant and failing. Eric's

mother had requested a change in Eric's program in April, 2003. The District held an IEP meeting in May, 2003 and November, 2003, and did nothing to address his then current needs. Ms. Rodriguez had cooperated with the District, attended all of the IEP meetings held, requested assistance from the Director of Special Education, Marvin Meyers, via letter. Ms. Rodriguez, a single mother with three children, worked full-time and was unable to police Eric's attendance at school. She relied upon the District to implement a program for her learning-disabled son that allowed him to benefit from his education. The District failed in this regard and Ms. Rodriguez took extraordinary measures to comply with a juvenile-court's order to educate her son. Ms. Rodriguez' monthly payments for the tuition loans for the court-ordered residential placements exceed $1,200.00 per month for years to come.

A school District should not be allowed to slip away from their obligations to learning-disabled students in need of an education simply because the Student has been made a ward of the court and placed back in the home of their parents. To sanction this type of negligent conduct by the District would undermine the IDEA and allow Districts to continue to ignore their most vulnerable students.

Kimberlin Rodriguez is entitled to reimbursement of all expenses incurred as a result of providing Eric an appropriate education.

DATED: February 27, 2008

LAW OFFICES OF SUSAN FOLEY

By_______/s/_____________________

_

SUSAN FOLEY
Attorney for Plaintiffs